In the Matter of William W. GOLLAHER, Incapacitated.

No. 50868.

Missouri Court of Appeals, Eastern District, Northern Division.

Dec. 23, 1986.

Motion for Rehearing and/or Transfer Denied Jan. 27, 1987.

Application to Transfer Denied March 17, 1987.

Mary L. Rhodes, Hannibal, for appellants William Gollaher and Dorothy Gollaher.

Mary Elise Burnett, Asst. Atty. Gen., Jefferson City, for respondent.

JOSEPH J. SIMEONE, Senior Judge.

I

This is an appeal from an order and judgment of the probate division of the Circuit Court of Pike County entered October 7, 1985 denying the "Application For Appointment of Guardian" filed by the appellants, Mr. and Mrs. Gollaher, the parents of their son William, an incapacitated person, and reaffirming and continuing an earlier order of the court appointing the public administrator of Pike County as the guardian of the person of William.[1] The parents of William appeal the ruling.

The dispositive issue on this appeal is whether the finding of the probate division

1. Earlier, on May 13, 1984, a petition for appointment of guardian was filed by the Hannibal Regional Center for the Developmentally Disabled and the court on May 30, 1985 appointed Leone Cadawallader, Public Administrator of Pike County as the guardian of William and continuing his placement in the Ruth Jensen Village, a state mental health facility, to which he had been admitted in 1979. On July 26, 1985, the parents filed a motion to set aside the May 30 order and requested a new hearing for the reason that the parents were not given reasonable notice before the May hearing, and the court did not consider the suitability of appointing the parents as guardians. They subsequently filed their "Application for Appointment of Guardian" and consent to serve. The court ordered a new hearing and overruled the motion to set aside. A hearing was held on the parents' "Application for Appointment" on October 7, 1985, and after evidence was taken, the court reaffirmed the appointment of the public administrator and the placement of Billy in a state facility.

that "the evidence was reasonably clear that the applicants, the parents, are not capable of the type of care and security this individual is entitled to" is supported by substantial evidence or against the weight of the evidence under the principles of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). For reasons hereinafter stated, we reverse and remand with directions.

On appeal the appellants, Mr. and Mrs. Gollaher, contend that the probate division erred in appointing the public administrator as the guardian for the reasons that the judgment is "wholly erroneous" in that the order of appointment is not substantiated by the evidence and therefore violates the principles established in *Murphy v. Carron, supra.* The respondent, State of Missouri, contends that the court did not err because the evidence was sufficient to show that the Department of Mental Health is the proper facility to provide "treatment and habilitation" of Billy. "The primary point of contention," says the state, "between the parties, and which formed the basis upon which the court denied the application [of the parents] involves the treatment and habilitation issues."

## II

The evidence at the October hearing shows that William and Dorothy Gollaher, have been married for some 23 years and have two adult children, William (known as Billy) and Linda. They reside in a rural area in the vicinity of Frankford, Missouri. Billy is a mentally incapacitated person with a low I.Q. Linda has higher functioning skills than Billy, but she too needs some training. Although Billy is mentally deficient, he can feed himself, shave, do simple household tasks such as make a bed or do the laundry under supervision but has difficulty in differentiating coins, and unless supervised may do such things as "taste detergent." He does not, however, pose a danger to himself or others. Evidence indicated that his condition is such that "the chances for him to ever become a member working in the competitive work force is highly unlikely."

In 1979 both children, Billy and Linda, were placed by the authorities in the Ruth Jensen Village, a state facility, because of some mental deficiencies and because of some substandard home conditions that existed at that time. In that year, Billy was made a ward of the Pike County Court and custody was given to the Department of Mental Health.

When Linda became 21 years of age she "signed" herself out of the Village and returned to her parents' farm home and has remained there since. She did so because she wanted to be "with my mom and dad."

At the evidentiary hearing on the parents' "Application For Guardianship." the evidence showed the following. Mr. Gollaher, is self-employed, does "odd labor jobs" and raises most of the food—vegetables and animals for the family. The family "cans" their own foods and have about 500 cans in stock. He works "in the fields," in "timber and grain" and in his work Billy could "help him." They rent a home which is a better one than they had in 1979. Mr. Gollaher is financially able to provide for the family, and to provide an "adequate," suitable home. He is aware of Billy's mental retardation, and conscious that Billy needs supervision. If permitted to be the guardian, Mr. Gollaher would teach Billy "how to fix" things such as fences but would not permit him to work with heavy machinery. He believed he could teach Billy the basic skills of survival in life and would provide "love" and "care," and "watch" and "supervise" him. As to "treatment and habilitation," the father testified that he would start Billy out, "just like a job" and "gradually let him learn on his own." He admitted he never attended any "treatment planning meetings" held by the Village nor discussed Billy's needs with social workers.

Mrs. Geneva Sims, Billy's "case manager" for about three years indicated that Billy is severely retarded, and that he would not likely be able to compete in the work force. She testified that "we" work "towards improvement of" Billy's status. She admitted that Billy can do "manual-

type" work and does such work in the facility's workshop, but needs love, care and supervision. She recognized that some severely retarded adults live with their parents and, if their habilitation needs are met, it is not "usually" harmful to the child.

The program specialist for the Ruth Jensen Village, Amy Vazquez, had daily contact with Billy in the Village. She indicated that a mentally retarded person needs a "structured" program. She testified that Billy was removed from the Ruth Jensen Village and transferred to another facility, in another county, for several reasons including his "unhappiness."

The administrator of Ruth Jensen Village, Macie Petrie, at the time Billy was there, testified that before Billy was transferred to a new facility from Ruth Jensen, he was beginning to "experience some problems." "He got very negative about everything, he didn't want to work, bathe, shave, or eat". Billy expressed his desire on "many occasions" to go "home." After Billy would visit his parents, which was described as "positive," and return to the Village, he "wouldn't want to do anything that he was supposed to do—I think, because he wanted to go back home." When he returned to the Village after home visits he was "confused" because he wanted to stay "home." On many occasions he expressed his desire to go home. "He would always look forward to his home visits."

None of these witnesses had ever visited the Gollaher home nor had personal contacts with the parents.

Certain relatives and an acquaintance of the family for many years testified that the Gollaher home is now "adequate," sufficient to provide basic needs, warm, and it has a "beautiful garden." The Gollahers are "good parents," and provide clothing and would provide their children with "love," "care," "affection," and finances.

Mrs. Gouch, a woman of mature years and mother of six, and an acquaintance of the Gollahers, who knew Billy as a "kid," and who frequently visited the Gollaher's residence testified that the Gollahers were able to provide for the family, loved their children, treated them "nice" and ruled

"fair." She said, "Really deep down in my heart, I believe in my soul that . . . that they'll do their best that they feel for their children." In her opinion it would be in Billy's best interests to live with the family. She even offered to help. All these witnesses testified that the parents would not abuse Billy.

Witnesses for the Hannibal Regional Center of the Department of Mental Health introduced the Diagnostic Evaluation Report and the "Individual Habitation [sic] Plan" for Billy. These witnesses stated that Billy needs a "very closely supervised habilitative environment" to allow him to grow in skills. The individual plan would have Billy working to improve his "self-help" and "basic learning skills." These witnesses indicated that Billy needs "very close supervision" in doing "chores." Otherwise he might do things such as "taste" liquid detergent. The Village has meetings involving the various disciplines to which the parents were invited, but the Gollahers "haven't been at any of them."

Mrs. Sims, Billy's case manager, testified that Billy needed a very closely supervised habilitation environment. She also testified that they stopped the parental home visitations because when Billy returned to the village he was "confused," his behavior deteriorated, and because he needed more structured supervision. In her opinion it would not be in the best interests of Billy to return home, because he needs supervision and training, and because he would not know how to use tools or mend fences, although she has never seen Billy mend fences. She admitted that Billy did enjoy going "home," and after the home visits stopped, his behavior deteriorated. Mrs. Sims admitted that even if the parents were appointed as guardians they would "have the right to leave him" at the state facility where he is now located in Ralls County.

Mrs. Vazquez described Billy's habilitation plan, which included learning how to differentiate coins, learning to make a bed and do laundry. He was transferred to a different facility because he worked well with one-on-one, and needed a lot of atten-

tion to achieve success. She did not know whether the parents would have the same "success" of teaching basic skills, but while the parents would have problems, it was not "impossible" for Billy's parents to teach him.

At the conclusion of the evidentiary hearing, the court found that:

> The Court's responsibilities in this matter direct themselves not only to this moment but to next week, next month, next year and next decade. The application for a change in guardianship ... directed itself toward a change in the subject's living arrangements. And I think the evidence was reasonably clear that the applicants, the parents, are not capable of the type of care and security that this individual is entitled to...."

> I believe that the—understand that the Court does not question the parent's concern or their love for this child or their willingness to do their very best for this child, if he was in the home. I do question their capabilities.

> The application for a change of guardianship will be denied, continuing the present arrangements.

## III

▇ In 1983, the Missouri General Assembly dramatically revised the "Guardianship Code" and the "old-fashioned terminology" used since the 1800's in guardianship proceedings. Outdated legal concepts were discarded, changes were made reflecting a new approach and a codification of the principle of the "least restrictive environment" was established in the law. *See* Mo. Bar CLE, *Guardianship and Trust Law*, ch. 1 (1986). The Code constituted a major change in Missouri law. *See In the Matter of Roland P. Weissinger*, 720 S.W.2d 430 (Mo.App.1986).

In the resolution of this proceeding, several sections of the new Guardianship Law are involved: Sections 475.010(7)[2] (defining "habilitation"); 475.010(9) ("least restrictive environment"); 475.050 (who may be appointed guardian of incapacitated person); 475.055 (qualifications of guardian); 475.-075(10) (if court finds incapacity it shall apply least restrictive environment) and 475.120 (powers and duties of guardian).

Construing these legislative commands, the standard of review in this court-tried cause is governed by *Murphy v. Carron, supra,* construing Rule 73.01—the judgment of the trial court is to be sustained unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law. 536 S.W.2d at 32; *See also Brown v. Storz,* 710 S.W.2d 402, 403 (Mo. App.1986).

In a case of this kind much must be left to the sound discretion of the trial judge confronted with the question, and appellate courts should defer to that discretion unless the ruling is against the circumstances, underlying policies, preferences of appointment, lack of substantial evidence or against the weight of the evidence to support the judgment. *Cf. Roots v. Reid,* 555 S.W.2d 54, 56 (Mo.App.1977).

Prior to 1983, when the Guardianship Code was adopted, the Code contained no indication of any preference to be given blood relatives in appointing a guardian. But the courts interpreted the Code to include a preference for the appointment of a relative. An instructive decision is *Roots v. Reid, supra.* There the probate court appointed the public administrator of Buchanan County for an incompetent woman. Her nephew had also petitioned to be appointed. The nephew appealed on the ground that as, a blood relative, he should have been appointed rather than the public administrator. Some of the evidence showed that the nephew provided food, lodging and other needs to his aunt but the probate court appointed the public administrator because the nephew lived in St. Louis, demonstrated no ability in "the business line" and was primarily interested in her money. The Western District reversed, finding no support for the judgment under *Murphy v. Carron.* The court relying on earlier cases, dealing with minors, held that there is a common law pref-

---

**2.** All references are to Mo.Rev.Stat.Cum.Supp. 1984.

erence to be given a relative over a stranger, other things being equal. *In re Brinckwirth's Estate,* 268 Mo. 86, 186 S.W. 1048, 1052 (1916)—quoting the homely proverb, "Blood will tell." The Court relying on *In re West,* 13 A.D.2d 599, 212 N.Y.S.2d 832, 834 (1961), adopted the rule of preference for appointment of a relative rather than a stranger unless the record discloses dissention in the family, the adverse interest of the relatives and the incapacitated person, the lack of business ability of the relative or any other reason whereby a stranger would best serve the interest of the incompetent. The "usual practice is to appoint a next of kin or other close blood relative." The court found that the findings by the trial court were not supported by the evidence and reversed with directions to appoint the incompetent's nephew as guardian.[3]

*In Matter of Tepen,* 599 S.W.2d 533 (Mo.App.1980), while this court affirmed an *initial* appointment of a stranger as the guardian for an incompetent, rather than the wife, during the time that the husband's assets were being accumulated and inventoried, we did quote from *Roots v. Reid, supra,* that in Missouri a relative should be appointed over a stranger unless other circumstances enunciated in *Roots* exist. This court, in *Tepen,* affirmed the probate division and found no abuse of discretion in *initially* (not necessarily permanently) appointing the wife as guardian. 599 S.W.2d at 535.

While preference of appointment ·is accorded to blood relatives, this preference is not absolute. But § 475.050, indicates the legislature's intent to maintain a preference for the relatives, subject to the exceptions stated in *Roots, supra.* In *Brown v. Storz, supra,* this court recently recognized that the mother of an incompetent should have been appointed guardian of the *person* and reversed the order of the probate court appointing another. *See also In the Matter of Roland P. Weissinger,* 720 S.W.2d 430 (Mo.App.1986). In *Weissinger,* we recognized that the personal relationship between a guardian and ward, reflected by common experience, indicates that a ward would probably prefer that a person close to him be appointed to look after his personal affairs rather than a stranger.

These Missouri decisions are in accordance with the law in other states. The general principles, outlined in numerous decisions, are that kinship and familial ties are regarded by the courts with partiality when the court finds it necessary to appoint a guardian for an incompetent or incapacitated person, and that unless there are "strong grounds" for appointing a stranger, the relative should be appointed. There is even a presumption that the relative by blood is likely to be more solicitous than a stranger for the incompetent's welfare. Hence, it is the "general practice" to appoint a blood relative as guardian. Love, concern, affection and consanguinity are important. *See Re Estate of Lamont,* 13 Ill.App.3d 714, 300 N.E.2d 574, 65 A.L.R.2d 987 (1973); *Annot.,* 65 A.L.R.3d 991 (1975).

## IV

■ Applying these legal principles to this cause, we hold that, under *Murphy v. Carron, supra,* the finding and judgment of the probate division is not supported by the substantial evidence and is against the weight of the evidence. While the state argues that the "primary point" of contention between the parties is that, if the parents were appointed guardians of Billy, he would not receive the "treatment" and "habilitation" necessary for Billy's needs, and that habilitation and treatment can be better provided under professional supervision in an habilitative environment allowing Billy to "grow" under an individual habilitation plan and supervision, we believe that the substantial and weight of the evidence indicates that the parents are capable of providing care, love, instruction, "habilitation" or "treatment" in the least restrictive setting.

---

**3.** *See also Perry v. Reed,* 184 S.W. 902 (Mo.App. 1916)—where minor's father and present wife who both showed good character since marriage and took care of minor were appointed over grandfather.

The state contends that habilitation can be better provided under supervision in an habilitative environment and pursuant to an individual habilitation plan. The state does not contend that the parents are unfit. Rather, the state argues that Billy can learn but it takes a "lot of time, patience and professional skills" in a structural environment. The state further argues against the appointment of the appellants because (1) the father did not know what kind of services and treatment are needed for Billy, and admitted he never attended any treatment planning meetings or discussed his son's needs with professionals, and (2) if the parents were to be appointed, the father would start his son out on jobs with him and gradually learn to mend fences and other farm activities.

But, the totality of the evidence is such that the finding and order of the probate division cannot be sustained.

The evidence shows that Mr. and Mrs. Gollaher have an "adequate" home; that they live together with a handicapped child, Linda; that they raise much of their own meat and food; that they desire to have their whole family reunited and that the father is financially able to provide basic needs and would help teach Billy the basic skills of life on a farm. Witnesses testified to their belief of the parents' love and support in the home. There was evidence that the parents could provide Billy with the supervision, care, habilitation and instruction necessary for Billy to cope more effectively with the demands of his own person and his environment. The evidence showed that if Billy were to be reunited with the family, he would be provided with supervision while learning and helping with farm activities. The father testified that he could help stimulate William to work to his potential and would not allow him to work with heavy machinery which might endanger him. The social workers who testified had no reason to believe that the parents could not teach William basic skills and household tasks, and one testified that some mentally retarded children are better off at home. The evidence showed the appellants were good parents providing love and care for each other. Linda testi-

fied that Billy wants to come "home." The witnesses for the Department of Mental Health admitted they had no firsthand knowledge of the parents' skills or fitness to care for William and perform a guardian's statutory duties. The parents' home is now a different one than the one they resided in 1979 when the two children were placed in Ruth Jensen Village; there was testimony that the family has enough to eat.

 The evidence is sufficient to satisfy the guardianship law which requires the guardians to fulfill their statutory duties and is consistent with the rule that the parents are to be preferred over a stranger. The evidence shows that the parents can provide habilitation instruction, training, supervision or treatment. Habilitation means "instruction," "training," or "treatment" designed to enable the person to acquire and maintain life skills needed to cope more effectively with the demands of his own person and his environment. The evidence shows that the parents are capable of providing such care, instruction and knowledge of basic home and farm skills, consistent with the amelioration of the person's mental capacity, under supervision in the least restrictive setting. When the totality of the evidence is examined and the statutes are linked under the aegis of the basic philosophy of the new Guardianship Law that an incapacitated person is to be placed in the "least restrictive" environment, we believe that the probate division erred in appointing the Public Administrator as the guardian of Billy. The totality of the evidence shows that under the facts of this case, the finding of the trial court that "the parents are not capable of the type of care and security that this individual is entitled to" and the appointment of the public administrator as guardian are erroneous.

This conclusion is not inconsistent with the choice of the parents' cooperating and working with case workers to follow an individual habilitation plan for Billy, if Billy is not retained in a state facility. Neither is our conclusion inconsistent with a deci-

sion of the parents to maintain Billy in a state facility if they opt to do so.

Under the new Guardianship Law, the facts and evidence in this case, and pursuant to judicial authority that parents are to be given a preferential status of appointment, we are compelled to reverse.

The order appointing the Public Administrator as guardian of the person of William W. Gollaher (Billy) is reversed and the court is directed to enter a judgment sustaining the parents' "Application For Appointment of Guardian," and appointing the parents as the guardians of the person.

Reversed with directions.

DOWD, P.J., and CRIST, J., concur.