**In the Matter of Orton MITCHELL, SSN#: 489–56–2021, Respondent/Appellant.**

**No. 20057.**

Missouri Court of Appeals, Southern District, Division One.

Jan. 31, 1996.

Bryan O. Wade, Farrington & Curtis, Springfield, for appellant.

Mark E. Orr, Ozark, for respondent.

BARNEY, Judge.

This is an appeal from an order of the trial court declaring Orton Mitchell totally disabled and incapacitated, and the appointment of a guardian and conservator. Mr. Mitchell cites three points on appeal: 1) the trial court erred in finding him totally disabled and incapacitated; 2) the trial court erred in its selection of a guardian and conservator; and 3) court appointed counsel failed to protect Mr. Mitchell's rights.

Orton Mitchell is an 84 year old man who has been blind since birth and is extremely hard of hearing. Before his brother, Clarence, passed away in 1992, he would help Mr. Mitchell with day to day activities as well as manage his checkbook. After Clarence's passing, Mr. Mitchell's sisters, Mary Stevens, Donnie Lemming, and Velma Hobbs, assumed the responsibility of looking in on him and seeing to his everyday needs. Mary Stevens also became a signatory on Mr. Mitchell's checking account. His monthly pension checks were deposited into their account or cashed. According to Ms. Lemming, another sister, Mary Stevens, used the check to pay for Mr. Mitchell's groceries, medicine, tobacco, and dog food and gave him $68.00 in spending money each month. In addition, she withdrew $3,000 of Mr. Mitchell's money from his account and placed it in a safe deposit box because there were too many people writing checks on his account. Also in 1992, some two years before the court hearing below, Mr. Mitchell conveyed his farm to his three sisters, reserving in himself a life estate. Shortly after the conveyance, Mr. Mitchell was quoted by Emmojean Hughes as saying, "... [W]ell, I did it. I

signed the place over to the sisters, but I can live here as long as I want to." [1] In July of 1994, Mr. Mitchell had a portion of his right leg amputated due to arteriosclerosis. Since that time, his sisters provided full-time, 24–hour care for him until they were no longer able to continue to care for him and on October 19, 1994, Mr. Mitchell was admitted to the Camelot Rose nursing facility. According to the testimony, Mr. Mitchell agreed to live at Camelot Rose.

On October 18, 1994, the day before he was to be admitted to the nursing home, Mr. Mitchell executed a general durable power of attorney naming David Moore his attorney-in-fact and giving him the authority to act in all of Mr. Mitchell's affairs, including care and medical treatment. David Moore is a resident of Strafford and has known Mr. Mitchell for approximately five years.

On December 13, 1994, Roger Crain, the public administrator for Christian County, at the request of the sisters, filed a petition for the appointment of a guardian and conservator for Mr. Mitchell. On December 14, 1994, John Waters was appointed as counsel for Mr. Mitchell in the guardian and conservatorship action. On December 22, 1994, David Moore removed Mr. Mitchell from Camelot Rose and he was not returned. At the hearing, Mr. Mitchell was also represented by private counsel, Bryan Wade.

The hearing took place on December 28, 1994. The trial court found Mr. Mitchell to be totally disabled (as to his ability to manage his financial affairs) and totally incapacitated (as to his ability to care for his physical needs) and appointed Roger Crain as his guardian and conservator.

■ Review of a court tried case is limited. The trial court will not be overturned unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously applies or declares the law. *Murphy v. Carron,* 536

---

1. This conveyance is now alleged by Mr. Mitchell to be fraudulent and is the subject of a separate lawsuit, filed in 1994, currently pending.

S.W.2d 30, 32 (Mo. banc 1976); *Estate of Ewing v. Bryan*, 883 S.W.2d 545, 550 (Mo. App.1994). On review of a court tried case, due regard is given the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(c)(2).[2] Furthermore, "we accept as true all evidence which is favorable to the prevailing party, including all inferences reasonably deducible therefrom, and we disregard any contradictory evidence." *Matter of Walker*, 875 S.W.2d 147, 151 (Mo.App.1994). The person petitioning for appointment as a conservator or guardian has the burden of proving incapacity or disability by clear and convincing evidence. *Matter of Hancock*, 828 S.W.2d 707, 708 (Mo.App.1992). Mere old age and forgetfulness will not render a person incompetent, *Matter of Nelson*, 891 S.W.2d 181, 187 (Mo.App.1995). This court sets aside a judgment on the grounds that it is against the weight of the evidence only when we have a firm belief that the judgment is wrong. *Id.*

## I.

For his first point, appellant contends that the trial court erred in finding him totally disabled and incapacitated. A review of the record on appeal reveals that the evidence was sufficiently clear and convincing to support the trial court's determination that appointment of a guardian and conservator was warranted.

A guardian is appointed for those persons adjudged to be incapacitated. A conservator is appointed for those adjudged to be disabled. § 475.030.1.[3] Section 475.010(9) defines an incapacitated person as:

"one who is unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that he lacks capacity to meet essential requirements for *food, shelter, safety or other care* such that serious physical injury, illness, or disease is likely to occur...."

(Emphasis added.)

A disabled person is defined in § 475.010(4)(a) as one who is:

"(a) Unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that the person lacks ability to *manage his financial resources.*"

(Emphasis added.)

The determination of whether or not to appoint a guardian or conservator is based on the respondent's condition at the time of the hearing. *Nelson*, 891 S.W.2d at 187. Mr. Mitchell is blind, very hard of hearing and is a partial amputee. He has always been aided by family and friends and since the time of his partial amputation, he has had to have constant care. His three sisters, along with a neighbor, shared the responsibility of providing this care until they were no longer able to do so; accordingly, Mr. Mitchell was admitted to the Camelot Rose Nursing Home. Pamra Thurman, the nursing home administrator and a registered nurse, testified that her staff provided 24–hour care for Mr. Mitchell. Because of his physical limitations he was assisted with bathing, toileting, dressing, and meal preparation and was unable to perform these tasks without assistance. Ms. Thurman also testified that Mr. Mitchell was often disoriented as to time and place. Mr. Mitchell is taking approximately five medications at different intervals of the day, administered by the nursing home staff.

There was evidence presented at the hearing that Mr. Mitchell has always had help with his finances. Before his brother passed away, he would write checks on Mr. Mitchell's account and since his passing, his sisters have taken over that responsibility. Currently, his only asset and source of income is his monthly disability check in the amount of $373.00. Mr. Mitchell's cousin, Emmojean Hughes, a next door neighbor all her life, also testified that Mr. Mitchell was "listless and ... wouldn't want to talk much." She also had the opinion that he was unable to take care of himself. Ms. Thurman testified that based on her overall experience of ob-

2. All rule references are to the Missouri Rules of Civil Procedure (1995).

3. All statutory references are to RSMo, 1994.

848

serving and taking care of dozens of nursing facility patients, and in particular her experiences and daily observations of Mr. Mitchell, that he was not capable of meeting his daily needs nor did she feel that he would be able to balance his checkbook or manage his own financial resources. She further testified that Mr. Mitchell would be unable to make independent evaluations of information presented to him and he would be susceptible to influence from others. Lastly, it is noteworthy that in the lawsuit filed against the sisters by David Moore, as next friend of Mr. Mitchell, he stated that:

"Plaintiff is a resident of the state of Missouri, County of Christian. Plaintiff is 84 years old, legally blind, infirm, *incapable of managing his own affairs.*"

(Emphasis supplied.)

As the trial court observed:

"If these lawyers and Mr. Moore had believed that Mr. Mitchell was competent, it would appear to me that they would have brought this lawsuit in Mr. Mitchell's name without the necessity of a next friend because of his admitted or alleged incompetency."

There is substantial evidence to support the hearing court's determination that Mr. Mitchell requires the appointment of a guardian and conservator. Point denied.

## II.

Appellant's second point is that the trial court erred in appointing Roger Crain as Mr. Mitchell's guardian and conservator instead of David Moore, Mr. Mitchell's attorney-in-fact through a durable power of attorney.

Section 475.050 in pertinent part states:

"1. Before appointing any other eligible person as guardian of an incapacitated person, the court shall consider the suitability of appointing any of the following persons who appear to be willing to serve:

(1) If the incapacitated or disabled person, is at the time of the hearing, able to make a reasonable choice, any eligible person nominated by him;

(2) Any eligible person nominated in a durable power of attorney executed by the incapacitated or disabled person, or in an instrument in writing signed by the incapacitated or disabled person and by two witnesses who signed at his request, before the inception of his incapacity or disability, at a time within five years before the hearing when he was able to make and communicate a reasonable choice;

(3) The spouse, parents, adult children, adult brothers and sisters and other close adult relatives of the incapacitated or disabled person;"

The order of preference of the above paragraphs is hierarchial. *Matter of Weissinger,* 720 S.W.2d 430, 434 (Mo.App.1986); *Couch v. Couch,* 824 S.W.2d 65 (Mo.App.1991). In reviewing a decision on whom to appoint, "much must be left to the sound discretion of the trial judge confronted with the question, and appellate courts should defer to that discretion unless the ruling is against the circumstances, underlying policies, preferences of appointment, lack of substantial evidence or against the weight of the evidence to support the judgment." *Matter of Gollaher,* 724 S.W.2d 597, 600 (Mo.App.1986). Section 475.050.2 states that:

"[E]xcept for good cause shown, the court shall make its appointment in accordance with the incapacitated or disabled person's most recent valid nomination of an eligible person qualified to serve as guardian of the person or conservator of the estate."

At the hearing, Mr. Mitchell expressed a preference that David Moore be appointed his guardian and conservator. Therefore, because of Mr. Mitchell's testimony and the durable power of attorney previously granted, Mr. Moore was entitled to preferential consideration under § 475.050.1(1) and (2). However, the decision of whom to appoint lies within the sound discretion of the trial

court. *Hancock,* 828 S.W.2d at 709; *In re Estate of Wood,* 852 S.W.2d 867, 868 (Mo. App.1993).

A review of the record calls into question whether or not Mr. Mitchell had the ability to understand the consequences of his having appointed Mr. Moore his power of attorney. There was testimony from Ms. Thurman, the nursing home administrator, regarding Mr. Mitchell and the power of attorney:

> "Q: Okay. Have you talked with Mr. Mitchell about the signing of the power of attorney?
>
> A: Yes. We had a conversation on that not too long ago.
>
> Q: And has that been since he has lived with you?
>
> A: Yes.
>
> Q: And what did he tell you with regard to that?
>
> A: He made the statement that he did not sign any paper. And I explained to him that there was a power of attorney paper that he was supposed to have signed, that signed over power of attorney. And he said he did not sign any paper. *If he did he didn't know what it was."*

(Emphasis supplied.)

Similarly, Donnie Lemming testified that she asked Mr. Mitchell about the durable power of attorney he gave to Mr. Moore:

> "Q: Did you—on a recent visit with Orton, did you talk with him about the power of attorney that he gave to David Moore?
>
> A: I did after I received a copy of it....
>
> Q: Did you read it to him?
>
> A: Yes, I did.
>
> Q: Did—What did he say about that?
>
> A: He said, 'Well, yes, *I know I signed something,* but he said, Not (sic) all of that '."

(Emphasis supplied.)

Also called into question was David Moore's genuine desire to attend to the med-ical care and treatment of Mr. Mitchell, free from any significant financial gain. Ms. Thurman testified that in response to health and medical decisions, Mr. Moore indicated he was [paraphrasing] not interested in health and medical decisions, that [he] was just interested in the land transferal. Additionally, David Moore paid for preparation of the durable power of attorney as well as private counsel for both the guardianship hearing, and for the civil action against the sisters which seeks to have the 1992 deed transferring land to his sisters [with a reserved life estate] to be voided and canceled.

There was testimony from Ms. Thurman that David Moore himself had made an offer to Mr. Mitchell to buy the farm:

> "Q: Has he [Mr. Mitchell] ever talked with you about his intentions were with regard to his farm?
>
> A: ... On [one] occasion he said he had a $23,000 offer for it and then the offer was $10 or $15,000 the next time he talked about it.... He said David made the $23,000 offer."

At conclusion of testimony the trial judge said:

> "I'm impressed with the efforts of the Moores to help him. I'm not willing to imply any bad motive to them or any ulterior motive, although *the action that they have taken bespeaks of something beyond a mere friendship or admiration for a kindly old gentleman* that they met around the horse business, but whatever that might be, I'm not going to imply it. *I speak specifically of the fact that [the sisters] and Orton had gone to Camelot Rose a week before the 19th of October, when he was admitted. And they made the decision during that week that he would go into the nursing facility because of their inability to provide 24–hour care since his return from his amputation on July the 15th. And that on the 18th, the day before he voluntarily went to Camelot, but certainly during the week that he was at home making his decision to go to Camelot, the durable power of attorney is executed.*

I'm also considering the fact that he has—*immediately following the service of the hearing*—service of the petition in this case, *he was removed by* the Moores from Camelot Rose *and apparently hasn't been back since.* There was no testimony as to why that occurred, whether Mr. Mitchell initiated that or whether the Moores initiated it, *but it's a strange circumstance.*"

(Emphasis supplied.)

The trial court is in a better position to judge the credibility of witnesses. Rule 73.01(c)(2). The trial court did not abuse its discretion in appointing the public administrator, Roger Crain, to act as Mr. Mitchell's guardian and conservator, given the statutory duties of the public administrator, his experiences in dealing with disabled and incapacitated persons, and given the absence of any financial interest relative to Mr. Mitchell's land. Point denied.

### III.

■ Appellant's final point alleges that court-appointed counsel, John Waters, failed to protect Mr. Mitchell's fundamental, constitutional and statutory rights. Section 475.075.8 guarantees certain rights to the alleged incapacitated person. Among these rights is the right to be represented by an attorney. Subsection 3 of that same section further states:

"Upon filing of a petition ... the court shall immediately appoint an attorney to represent the respondent in the proceeding. The attorney shall visit with his client prior to the hearing. If the client is capable of understanding the matter in question or of contributing to the advancement of the client's interest, the attorney shall obtain from the client all possible aid. If the disability of a client compels the attorney to make decisions for the client, the attorney shall consider all circumstances then prevailing and act with care to safeguard and advance the interests of the client...."

The record is not clear as to whether or not John Waters was able to meet with Mr.

Mitchell in advance of the hearing day. Mr. Mitchell had theretofore been removed from the nursing home by David Moore on December 22, 1994, shortly after the guardianship/conservatorship petition was filed. However, the record reveals that John Waters conducted an investigation and interviewed witnesses before the day of the hearing. He was able to speak with Mr. Mitchell just prior to the hearing. The purpose of the statute is to ensure that counsel visits with his client prior to the hearing "to determine whether the client is capable of understanding the guardianship proceeding or of contributing to the advancement of his own interests." *In re Jessee,* 744 S.W.2d 514, 516 (Mo.App.1988).

In *In re Link,* 713 S.W.2d 487, 495 (Mo. banc 1986), the Supreme Court of Missouri noted, "[W]e ... recognize the dilemma facing counsel in ascertaining the client's wishes, and then determining what role he or she is required to play in protecting both the client's rights *and* interests." (Emphasis in original.)

■ Section 475.075.3 makes the substitution of private counsel for appointed counsel discretionary with the trial court. "The legislature's decision to make the substitution discretionary reflects a recognition that, while an individual has a right to be represented by an attorney of her choice, an alleged incompetent *may be susceptible to the influence of persons whose own self-interests are foremost in their minds.*" (Emphasis supplied.) *Link,* 713 S.W.2d at 497. At oral argument it came to the attention of this court that a discussion was had with the trial judge concerning Mr. Mitchell's representation by both private and court appointed counsel. Unfortunately, we do not have the benefit of a record of that discussion to ascertain why court appointed counsel remained involved in the trial. However, under the *Link* decision, we can deduce that the trial court felt that Mr. Mitchell's interests would best be served by allowing private *and* appointed counsel to remain. "The trial court must satisfy itself that the alleged incompetent wishes to be represented by private counsel, *and has the capacity to make such a choice.*" (Emphasis supplied.) *Id.* "If after receiving appointed counsel's report [from the pre-hearing investigation], the trial

court continues to have doubts about private counsel's ability to represent his client's rights and interests, the court may require that appointed counsel continue service as co-counsel, or as a guardian ad litem." *Id.* at 498. It is apparent that the trial court, herein, had its misgivings about the circumstances under which David Moore wanted to serve as guardian and conservator; consequently the trial court felt that appointed counsel should remain involved as a *guardian ad litem.*[4]

In the context of this hearing, the role of guardian ad litem as opposed to a private attorney, while similar in many respects, does differ in the final analysis. It is clear that a guardian ad litem is "not a mere figurehead, but is required to take all steps reasonably necessary to protect and promote the interests of his ward in the litigation". *In Re M____,* 393 S.W.2d 109, 115 (Mo.App. 1965); *State ex. rel. Schwarz v. Ryan,* 754 S.W.2d 949, 951 (Mo.App.1988). However, the guardian ad litem is also answerable to the court as well as to his ward and "he can make no major decisions affecting a substantial right of his ward without obtaining court approval, by showing the court the decision made would be in the ward's *best interest."* *Schwarz* at 951.[5] (Emphasis supplied.) Thus what might constitute the best interests of his ward during the course of litigation, may not necessarily comport with his ward's perceived wishes or desires.

Mr. Mitchell's desires, rights and interests were adequately represented by private counsel acting as his advocate and court appointed counsel acting as guardian ad litem. Point is denied.

The trial court's ruling is affirmed.

PARRISH and PREWITT, JJ., concur.

---

4. § 475.010(6) RSMo, provides that, "A 'guardian ad litem' is one appointed by a court, in which particular litigation is pending, to represent a minor, an incapacitated person, a disabled person, or an unborn person in that particular proceeding or as otherwise specified in this code."

5. In the context of child custody and juvenile proceedings, the guardian ad litem acts as an *agent* of the court in providing information bearing on the best interests of the child untainted by parochial interests of other parties. *In re Marriage of Patroske,* 888 S.W.2d 374, 385 (Mo.App. 1994).