The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 7, 2019

**2019COA20**

**No. 18CA0548, *Interest of Arguello* — Probate — Persons Under Disability — Guardianship of Incapacitated Person — Judicial Appointment of Guardian**

In this adult guardianship case, a division of the court of appeals holds, as a matter of first impression, that all prospective guardians must undergo the statutory vetting process set forth in sections 15-14-304 and 15-14-305, C.R.S. 2018, before appointment may occur. The division concludes that the trial court erred in sua sponte appointing a guardian who did not go through this process. The division further concludes that the trial court did not abuse its discretion in rejecting a proposed guardian based on a potential conflict of interest between the proposed guardian and her employer and, therefore, does not address whether the proposed

guardian has a statutory conflict of interest precluding her appointment under section 15-14-310(4) and (5), C.R.S. 2018. The division affirms in part, reverses in part, and remands for further proceedings under sections 15-14-304 and -305.

The dissent concludes that section 15-14-310(4) and (5) provides the only basis for denying guardianship based on a conflict of interest. It would vacate the trial court's order and remand for the trial court to either identify reasons, other than a conflict of interest, that disqualify the proposed guardian or appoint the proposed guardian as guardian.

Court of Appeals No. 18CA0548
Pueblo County District Court No. 16PR215
Honorable Allison P. Ernst, Judge

In re the Interest of Louis "Barney" Arguello, protected person, and the Arc of Pueblo,

Respondents-Appellees,

v.

Fe Ana Baslick and Colorado Bluesky Enterprises, Inc.,

Petitioners-Appellants.

ORDER AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE FREYRE
Román, J., concurs
Webb, J., concurs in part and dissents in part

Announced February 7, 2019

Linda L. McMillan, BuxmanKwitek, P.C., Pueblo, Colorado, for Petitioners-Appellants

Melinda Badgley, Guardian Ad Litem

William J. Ballas, Pueblo, Colorado, for Respondents-Appellees

¶ 1     This is an adult guardianship appointment case where a prospective guardian, Fe Ana Balsick, and her employer, Colorado Bluesky Enterprises, Inc., appeal the district court's order sua sponte appointing the Arc of Pueblo (ARC) as the permanent guardian for Louis "Barney" Arguello, the incapacitated person.  We are asked to answer a novel question: Must the district court appoint a court visitor and follow the statutory vetting procedures outlined in sections 15-14-304 and -305, C.R.S. 2018, before it can appoint a guardian for an incapacitated person?  We answer that question "yes."  We hold that the court is required to appoint a visitor for every petition for guardianship filed and that all prospective guardians must undergo the statutorily mandated process outlined in sections 15-14-304 and -305 before the court can appoint a guardian.  Because the ARC was not subjected to this statutory vetting process, we reverse the court's order and remand for further proceedings.

I.     Background

¶ 2     Mr. Arguello, an adult resident of Pueblo, suffers from dementia, developmental disability, and mental health illness.  He has spent most of his life with his parents in Denver.  He moved to

Pueblo sixteen years ago with his sister, Lynn Quintana, after his mother died.

¶ 3     Mr. Arguello receives services from Pueblo Community Resources (PCR), where Nora McAuliff supervises his care. He lives in a host home with a caregiver he has known for many years. In 2016, the court appointed Ms. Balsick to be an emergency guardian when medical decisions needed to be made and family was unavailable.[1]  Soon thereafter, several persons petitioned the court to be appointed permanent guardian.

¶ 4     Petitioner McAuliff initially nominated Ms. Balsick as sole guardian and later nominated Mr. Arguello's older sister, Adele Uballe, who lives in Pueblo, to be co-guardian with Ms. Balsick. Ms. Quintana and her daughter, Tammy Gonzalez, also petitioned the court to be Mr. Arguello's co-guardians. They both live in Denver and planned to move Mr. Arguello to Denver if appointed.

¶ 5     The court appointed court visitor Julie Thompson-Polk to prepare a visitor's report concerning all prospective guardians, and it set the matter for a hearing. Ms. Thompson-Polk prepared three

_____

[1] Ms. Quintana and her husband moved back to Denver in 2016.

reports. The first report investigated and considered the appointment of Ms. Balsick as sole guardian. It did not recommend Ms. Balsick's appointment because of her employment with Bluesky and the existence of a potential conflict of interest under section 15-13-310(4), C.R.S. 2018 (precluding a long-term care provider from also serving as a guardian). A first amended report also investigated and considered the appointment of Ms. Quintana and Ms. Gonzalez as co-guardians. The amended report expressed concerns about Mr. Arguello living with Ms. Quintana and Ms. Gonzalez and being moved to Denver. A second amended report investigated and considered the proposed co-guardianship of Ms. Balsick and Ms. Uballe and repeated the potential conflict concerns about Bluesky and Ms. Balsick.

¶ 6 After several hearings, the court found that Ms. Quintana and Ms. Gonzalez were not suited to be co-guardians because a move to Denver would not be in Mr. Arguello's best interests. As well, the court found that Ms. Uballe would not be a suitable guardian due to her physical limitations, her advanced age, and her distant relationship with Mr. Arguello. Finally, the court found that Ms. Balsick would not be a suitable guardian because she was

employed by Bluesky, which also served as Mr. Arguello's long-term care provider, as defined in section 15-13-310(4), C.R.S. 2018, of the Colorado Uniform Guardianship and Protective Proceedings Act (CUGPPA). The court concluded that a conflict of interest precluded Ms. Balsik's appointment because she could potentially be required to choose between Mr. Arguello's best interests and those of her employer, Bluesky.

¶ 7     Finding no suitable guardian from among the petitioners, the court sua sponte appointed ARC, for good cause, because (1) ARC does not provide long-term care or case management services for individuals and, thus, would have no conflict of interest; and (2) the court was aware that ARC serves as guardian for many other individuals with developmental disabilities in Pueblo County.

¶ 8     Bluesky and Ms. Balsick moved for reconsideration, contending that (1) the court erred in finding that Bluesky was a long-term care provider as defined by the statute and (2) ARC was improperly appointed because no petition nominating it as a guardian had been filed. The court denied the motion for reconsideration stating, "[e]ven if the facts of the case do not fall squarely within C.R.S. § 15-14-310(4) [the prohibition against

4

appointment of employees of long-term care providers], this Court has jurisdiction to appoint the guardian it believes will best serve [Mr. Arguello's] interests." The court also found that it had broad discretion to appoint a guardian and noted that Bluesky had offered no legal authority requiring that the guardian be reviewed by a court-appointed visitor.

## II. The Court Did Not Abuse Its Discretion in Refusing to Appoint Ms. Balsick as Guardian

¶ 9    Bluesky first contends that it is not a long-term care provider under the statute and that PCR serves that role for Mr. Arguello. It reasons that because it provides case management services, not prohibited under section 15-14-310(4), the court legally erred in applying the statutory prohibition to Ms. Balsick. Bluesky further argues that the court's ruling effectively gives ARC a monopoly on professional guardian services in Pueblo. Because we conclude that the court acted within its discretion in finding that Mr. Arguello's best interests would not be served by appointing Ms. Balsick, given the potential for a conflict to arise, we need not decide whether Bluesky is a long-term care provider under section 15-14-310(4).

### A. Additional Facts

¶ 10 The conflict issue first arose in the visitor's report. Ms. Thompson-Volk noted that Bluesky provides Mr. Arguello with case management services under Colorado's comprehensive services DD waiver, and she opined that this implicated the prohibitions listed in section 15-14-310(4) and (5). She noted that Ms. Balsick, as guardian, "would have the duty and obligation to select the Respondent's service providers during the service plan meeting," and that, "in theory, [she] could change the Respondent's service provide[r] so [that] [Bluesky] would provide additional services to the Respondent." Ms. Thompson-Volk further noted that the guardian would participate in Mr. Arguello's annual Supports Intensity Scale Assessment, used to determine his funding level, and that Bluesky, acting through Ms. Balsick, could theoretically "generate additional income for itself." Finally, Ms. Thompson-Volk noted that the DD waiver required Bluesky to investigate mistreatment allegations, and she questioned whether appointing a Bluesky employee as guardian was in Mr. Arguello's best interests.

¶ 11 At the hearing, petitioner McAuliff was asked to explain Bluesky's role in Mr. Arguello's life. She testified that Mr. Arguello has a Bluesky service coordinator whose function is to "monitor the

services that we, as an agency [PCR] provided, as well as coordinat[e] his services." She agreed that Bluesky provides case management services, and that she is "subject to supervision from [Bluesky] as to how those services [were] being followed." She further explained that the Bluesky coordinator is involved in the annual staffing to determine who will provide what services for the coming year.

¶ 12    Ms. Balsick testified that Bluesky's service coordinator is paid by Medicaid, while she, as Bluesky's guardianship coordinator, is paid through a grant. She admitted that she receives her salary and benefits from Bluesky, and that she is "treated the same as any employee of [Bluesky]." Ms. Balsick agreed that Bluesky provides Mr. Arguello with case management services which assist eligible individuals to "gain access to needed medical, social, educational and other services." She also testified the same person cannot be both the service coordinator and the guardian of the same individual at Bluesky, but she conceded that Bluesky employs and pays persons in both positions. And she explained that PCR is Mr. Arguello's "direct service provider."

¶ 13    District courts enjoy wide discretion when appointing a guardian.  *See In re Estate of Runyon*, 2014 COA 181, ¶ 8 ("[T]he decision of whom to appoint lies within the sound discretion of the trial court." (quoting *In re Mitchell*, 914 S.W.2d 844, 848 (Mo. Ct. App. 1996))); 3 A. Kimberley Dayton et al., *Advising the Elderly Client* § 34:40, Westlaw (database updated June 2018) (stating district courts are in a "better position to judge the character, and appropriateness of those who would be guardian" than appellate courts).  Accordingly, we review a district court's appointment of a guardian for an abuse of discretion.  *Runyon*, ¶ 9.  A court abuses its discretion if the appointment is manifestly arbitrary, unreasonable, or unfair, or if the court misconstrues or misapplies the law in entering the appointment order.  *Id.*

¶ 14    Whether the court properly interpreted and applied the relevant statute is a legal question that we review de novo.  *Miller v. Hancock*, 2017 COA 141, ¶ 24.  In interpreting a statute, we give statutory words and phrases their plain and ordinary meanings.  *Id.* "If a statute is clear and unambiguous on its face, then we need not look beyond the plain language, and 'we must apply the statute as

written.'" *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo. 2004) (citations omitted).

¶ 15    The power to appoint a legal guardian for an incapacitated person lies with the district court. § 15-14-301, C.R.S. 2018. The court may appoint a guardian if it finds by clear and convincing evidence that the respondent is an incapacitated person whose needs cannot be met by less restrictive means. § 15-14-311, C.R.S. 2018. The court must appoint the person it believes is best suited to protect the best interests of the incapacitated person. *See* §§ 15-14-310, -314(1), C.R.S. 2018.

¶ 16    While a nonprofit corporation is eligible for guardianship appointment, § 15-14-310 cmt., section 15-14-310(4) states that "[a]n owner, operator, or employee of a long-term-care provider from which the respondent is receiving care may not be appointed as guardian unless related to the respondent by blood, marriage, or adoption." Long-term care is defined as

> services designed to provide diagnostic, preventive, therapeutic, rehabilitative, supportive, and maintenance services for individuals who have chronic physical or mental impairments, or both, in a variety of institutional and noninstitutional settings, including the home, with the goal of promoting

the optimum level of physical, social, and
psychological functioning of the individuals.

§ 25.5-6-104(2)(h), C.R.S. 2018.

¶ 17    Case management services are defined as

> the assessment of a long-term care client's
> needs, the development and implementation of
> a care plan for such client, the coordination
> and monitoring of long-term care service
> delivery, the direct delivery of services as
> provided by this article or by rules adopted by
> the state board pursuant to this article, the
> evaluation of service effectiveness, and the
> reassessment of such client's needs . . . .

§ 25.5-6-104(2)(b).

## C.    Application

¶ 18    In finding that Bluesky is a long-term care provider under

section 15-14-310(4), the court considered the definitions of long-

term care provider and case management services, as well as the

official comment to section 15-14-310, which provides as follows:

> A professional guardian can still be appointed
> guardian if no one with priority is available
> and willing to serve or if the Court, acting in
> the respondent's best interest, declines to
> appoint a person having priority.  A public
> agency or nonprofit corporation is eligible to be
> appointed guardian as long as it can provide
> an active and suitable guardianship program
> and *is not otherwise providing substantial
> services or assistance to the respondent,* but is

10

not entitled to statutory priority in appointment as guardian.

(Emphasis added.)

¶ 19    The court recognized that while the facts of this case may not fall "squarely" within the long-term care provider exception of section 15-14-310(4), they nevertheless demonstrated a potential conflict of interest between Bluesky and Ms. Balsick that rendered her unsuitable as a guardian for Mr. Arguello.  And the record demonstrates that Bluesky "provides substantial assistance" to Mr. Arguello in the form of case management services.  The court acknowledged Ms. Balsick's professionalism and experience, but determined that because she is employed by Bluesky, it would not be in Mr. Arguello's best interest for her to serve as his guardian.

¶ 20    We discern no abuse of discretion in the court's finding and conclude that it is well supported by the record.  Indeed, petitioner McAuliff, an employee of PRC, admitted that she is supervised by Bluesky, which also employs Ms. Balsick.  And Ms. Balsick admitted that Bluesky's service coordinator, with input from the guardian, determines Mr. Arguello's needed services and service providers, including whether to continue with PCR and whether to

request additional services through Bluesky. Therefore, regardless of whether Bluesky technically meets the statutory definition of a long-term care provider, Ms. Balsick, as its employee, would have the ability, as guardian, to recommend increased funding for Mr. Arguello and thereby generate revenues for Bluesky. Moreover, as guardian, Ms. Balsick would have oversight of Bluesky's case management services and could be hesitant, as a Bluesky employee, to question Bluesky's actions. Because a trial court is in the best position to judge the character and appropriateness of those who would be guardian, we discern no abuse of discretion and therefore affirm the court's order refusing to appoint Ms. Balsick. *Runyon,* ¶ 8; *Estate of Keenan v. Colo. State Bank & Tr.,* 252 P.3d 539, 540 (Colo. App. 2011) (affirming probate court's finding due to sufficient record support); *see also In re Guardianship of Kowalski,* 478 N.W.2d 790, 792 (Minn. Ct. App. 1991) (recognizing under Minnesota's version of the uniform act, which Colorado's law is also based on, that "[t]he appointment of a guardian is a matter peculiarly within the discretion of the probate court").

### III. The Court Erred in Appointing ARC Without Appointing a Court Visitor Under Section 15-14-305(1)

¶ 21 Bluesky next contends that the court violated the statutory mandate in section 15-14-305(1) by appointing ARC without first appointing a visitor and receiving a report. Because the statute's plain language requires appointment of a court visitor, we agree. Therefore, we reverse the court's order appointing ARC as guardian for Mr. Arguello, and we remand the case to appoint a visitor, prepare a visitor's report, set a hearing, and enter a new order appointing a guardian for Mr. Arguello.

### A. Standard of Review and Law

¶ 22 We review the district court's application of law de novo. *Miller*, ¶ 24. We do so under the standard set forth in Part II(B).

### B. Colorado's Guardianship Act

¶ 23 The CUGPPA is based on the Uniform Guardianship and Protective Proceedings at of 1997 (UGPPA) law and, therefore, "consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it" when applying and construing it. § 15-14-121, C.R.S. 2018. The purpose of guardianship is to protect and assist incapacitated

persons; however, because a guardian constitutes a restriction on an incapacitated person's liberty or access to property, guardianship proceedings implicate and require due process of law. U.S. Const. amend. XIV ("No State shall . . . deprive any person of life, liberty, or property, without due process of law."); *Spohr v. Fremont Cty. Dep't of Human Servs.*, 2018 COA 74, ¶ 1.

¶ 24    Effective January 1, 2001, Colorado adopted the UGPPA. Ch. 368, sec. 1, §§ 15-14-101 to -433, 2000 Colo. Sess. Laws 1778-1832; Unif. Guardianship & Protective Proceedings Act (Unif. Law Comm'n 1997). [2] The purpose of the UGPPA is to strengthen the due process rights of incapacitated persons who face involuntary guardianship, and it therefore emphasizes limited guardianships and views permanent guardianships as a "last resort." Unif. Guardianship & Protective Proceedings Act prefatory note. ("[L]imited guardianships or conservatorships should be used whenever possible, and the guardian or conservator should always

---

[2] The District of Columbia, four states (Alabama, Hawaii, Massachusetts, and Minnesota), and one United States Territory (the U.S. Virgin Islands), have also adopted the UGPPA.

consult with the ward or protected person, to the extent feasible, when making decisions.").

¶ 25    As well, the UGPPA entitles an incapacitated person to notice and a hearing, unless the court finds that such person would be substantially harmed if the appointment were delayed.  UGPPA § 312.  And, it limits emergency guardianship appointments to sixty days.  *Id.*; *see* § 15-14-312(1), C.R.S. 2018; *Spohr*, ¶ 25.

¶ 26    The prefatory note to the UGPPA summarizes the substantial changes from the previous version.  As relevant here, the UGPPA specifies "procedural steps . . . which must be met before a guardian for an incapacitated person or conservator can be appointed," including the "[s]pecific information . . . required in the petition" and that "the court must appoint a visitor."  *Id.*  The prefatory note cites sections 304 and 305, which correspond to sections 15-14-304 and 15-14-305 of the CUGPPA.  Moreover, the prefatory note clearly states that "a visitor is appointed in *every proceeding* for appointment of guardian under Article 3."  *Id.* (emphasis added).  Article 3 of the UGPPA concerns guardianship proceedings of adult incapacitated persons and corresponds to Part 3 of the CUGPPA.

¶ 27    Additionally, the official comments to sections 304 and 305 of the UGPPA expand on the mandatory nature of the vetting process.[3] The comment to section 304 states that the petition for appointment "must" contain the information listed because the information is useful to the court in making an informed decision regarding the appointment.  The comment to 305 states that "[a]ppointment of a visitor is mandatory . . . .  The visitor serves as the information gathering arm of the court."  And it states that the visitor's report "must be in writing and include a list of recommendations or statements."  UGPPA § 305 cmt.  The comment describes only one exception to visitor appointment: "If the petition is withdrawn prior to the appointment of a visitor, no appointment of a visitor is necessary."  *Id.*

¶ 28    Colorado law incorporates the UGPPA.  The appointment process begins with the filing of a petition containing the required information.  *See* § 15-14-304.  "Upon receipt of a petition to establish a guardianship, the court shall set a date and time for

_____

[3] We acknowledge that the UGPPA's comments were not formally adopted by the General Assembly and thus, do not have the force of law.  Nevertheless, we find them persuasive.

hearing the petition and appoint a visitor." § 15-14-305(1). Thereafter, the visitor must interview relevant persons listed in the statute, including the incapacitated person, and must file a report with the court containing recommendations "regarding the appropriateness of guardianship." § 15-14-305(3), (4), (5)(c).

¶ 29　　In appointing a guardian, the court must follow the priority rules set forth in section 15-14-310. While these rules give first priority to family members, they also give the court the authority to appoint the most qualified person, even if that person does not have statutory priority. § 15-14-310(3). Subject to exceptions not relevant here, a direct service or long-term care provider may not also serve as a guardian. § 15-14-310(4), (5).

C.　　Analysis

¶ 30　　Against this backdrop, we hold that the plain language of section 15-14-305(1) mandates the appointment of a court visitor, and that the plain language of section 15-14-305(3)-(5) requires the court to receive the visitor's report before appointing a guardian. *Aren Design, Inc. v. Becerra*, 897 P.2d 902, 904 (Colo. App. 1995) ("The use of the word 'shall' in the statute is presumed to indicate a mandatory requirement."). This construction is consistent with the

official comments to the UGPPA explaining that the visitor is the information gathering arm of the process who protects the incapacitated person's right to due process. *See Runyon,* ¶ 12 (finding official comments persuasive). And neither the statute nor the comments contain an exception to this process that could be applied here.[4]

¶ 31 Finally, we are not persuaded that the court's "good cause" finding requires a different result. The statute contains no "good cause" language permitting the court to appoint a guardian without first appointing a visitor and reviewing the visitor's report. And we may not read language into the statute that does not exist. *Boulder Cty. Bd. of Comm'rs v. HealthSouth Corp.,* 246 P.3d 948, 954 (Colo. 2011).

## IV. Conclusion

¶ 32 We reverse the court's order appointing ARC as Mr. Arguello's guardian. We remand the case for the court to appoint a visitor, to follow the procedures set forth in sections 15-14-304 and -305, and

---

[4] Our holding should not be construed as favoring or disfavoring the appointment of ARC as guardian. Further, the court retains the discretion to appoint ARC as an emergency guardian pending completion of the further proceedings.

to appoint a suitable guardian for Mr. Arguello.  In all other respects, the order is affirmed.

JUDGE ROMÁN concurs.

JUDGE WEBB concurs in part and dissents in part.

JUDGE WEBB concurs in part and dissents in part.

¶ 33    The majority concludes that the trial court did not abuse its discretion in finding that while the issue could not be resolved under section 15-14-310(4), C.R.S. 2018, a potential conflict of interest between Bluesky and Ms. Balsick rendered Ms. Balsick an unsuitable guardian for Mr. Arguello.  In my view, this conclusion begs the question whether the court had any discretion to consider conflicts of interest other than those set out in section 15-14-310. Because I read this statute as fully addressing the conflict problem, I respectfully dissent.

¶ 34    On the one hand, section 15-14-310(1) identifies categories of "otherwise qualified" persons who may be appointed as guardians. The list includes spouses and adult children.

¶ 35    But spouses have the same potential conflict that the court visitor ascribed to Ms. Balsick.  Where a spouse as guardian advocated for reduced services to the protected person, marital assets otherwise spent for such services would be available to the spouse.  An adult child who was also a beneficiary of the protected person's will would have a similar conflict in that reducing services

20

to the protected person would increase the value of the probate estate.

¶ 36     On the other hand, the statute identifies relationships where the potential for conflict is disqualifying.  The majority discusses section 15-14-310(4).  In addition, subject to certain exceptions, under section 15-14-310(5), "the same professional may not act as an incapacitated person's or a protected person's: (I) Guardian and conservator; or (II) Guardian and direct service provider; or (III) Conservator and direct service provider."  Simply put, the General Assembly has squarely taken up the conflict problem.

¶ 37     Neither ARC nor, for that matter, the majority, cites any authority for the proposition that where a statute has addressed a category — here, conflicts of interest — of prohibited conduct, courts retain discretion to broaden the scope of the prohibition.  Nor have I found any in Colorado.  To the contrary, "[w]hen the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others." *Lunsford v. W. States Life Ins.*, 908 P.2d 79, 84 (Colo. 1995); *see generally In re C.T.G.*, 179 P.3d 213, 217 (Colo. App. 2007) ("[T]he General Assembly has

21

spoken and has established only limited circumstances in which a person other than a parent may be awarded visitation rights to a child."). And none of the conflicts identified in section 15-14-310 apply to Ms. Balsick.

¶ 38 Here, the trial court effectively added a new category of impermissible conflict. But a court does not "add words to [a] statute . . . . [W]e cannot supply . . . missing language . . . ." *Turbyne v. People*, 151 P.3d 563, 567-68 (Colo. 2007); *see also Boulder Cty. Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo. 2011) (same). As well, the comment to section 310 of the Uniform Guardianship and Protective Proceedings Act, "on which section 15-14-310 is based," *In re Estate of Runyon*, 2014 COA 181, ¶ 12, calls for "[s]trict application of this subsection," Unif. Guardianship & Protective Proceedings Act § 310 cmt. (Unif. Law Comm'n 1997).

¶ 39 For these reasons, I would vacate the order appointing ARC as guardian and remand the case for the trial court to either identify reasons other than a potential conflict of interest that disqualify Ms. Balsick or appoint her as guardian. If the court again disqualifies

Ms. Balsick, then I agree with the majority that ARC cannot be appointed without a visitor's report.