In the Matter of Margaret M. NELSON, Incapacitated.

Margaret M. NELSON, Appellant,

v.

Grant M. (Bill) NELSON, et al., Respondent.

No. WD 49190.

Missouri Court of Appeals, Western District.

Jan. 24, 1995.

Ann E. Robards, Kansas City, for appellant.

Thomas C. Capps, Liberty, for respondent.

Before HANNA, P.J., and
BRECKENRIDGE and SMART, JJ.

SMART, Judge.

This case involves the involuntary appointment of a guardian and conservator for an 86 year old woman. Margaret M. Nelson appeals from the trial court's judgment finding her to be partially incapacitated and totally disabled.

Judgment is affirmed in part and reversed in part.

Margaret Nelson was born on July 7, 1907. She has several college degrees and formerly was a science teacher and business teacher. Mrs. Nelson has one child, Bill Nelson, who was born on September 7, 1937 and resides in Texas. She executed a power of attorney in favor of Bill Nelson in 1985 which he did not have occasion to use until Mrs. Nelson's 1993 illness. Mrs. Nelson lived alone in her home on acreage near Smithville Lake. Between May and July 1993, she underwent several major surgeries, including colostomy surgery, and spent time in three different hospitals. Prior to her surgery, she opened a joint checking account so that her son could pay her bills and transact business while she was hospitalized. Her son, a teacher, spent ten weeks in Missouri while she was hospitalized. Mr. Nelson proceeded under the 1985 power of attorney to change Mrs. Nelson's bank accounts to joint ownership with survivorship rights. He took over her financial matters. He instructed the bank to mail all bank statements to his home in Texas. He inventoried all items contained in her safety deposit box. Mr. Nelson removed the valuables from Mrs. Nelson's farm home and changed the lock.

Upon Mrs. Nelson's release from the hospital, Mr. Nelson placed her in a nursing home against her will and declined her requests to release her to go home. Mrs. Nelson released herself from the facility on October 14, 1993 with the help of a friend. She revoked the power of attorney previously granted to her son. She regained control of the bank accounts and voided the joint ownership except as to one account. She currently lives in her home. She arranged for a woman named P.J. Phelps to live with her. She has a neighbor and friend, Sheryl Burnett, who visits her practically every day. Since Mrs. Nelson has poor eyesight, Mrs. Burnett has been assisting her with her financial affairs, and drives her to the bank, doctor's office, and other places. We gather from the record that Mrs. Nelson has several hundred thousand dollars of income producing assets. Even after her surgeries, she has dealt directly with her tax preparer and her stock broker.

On October 20, 1993, shortly after Mrs. Nelson regained control of her affairs, Bill Nelson filed an application for the appointment of himself as his mother's guardian and conservator. Mrs. Nelson filed a motion to dismiss the application. A hearing was conducted on December 9 and 10, 1993. After hearing testimony both attacking and supporting Mrs. Nelson's competency, the trial judge entered judgment of partial incapacity and total disability. The trial judge appointed the public administrator to be Mrs. Nelson's guardian. Mrs. Nelson filed a motion for a new trial on December 30, 1993 and on March 7, 1994, she filed a motion for reconsideration. Both motions were denied. Mrs. Nelson appeals.

### New Evidence

First, we take up appellant's contention that the trial court erred in denying appellant's motion for new trial and motion for reconsideration.[1] She asserts the trial court disregarded new evidence of her current medical and physical condition which had direct bearing on the issues of disability and incapacity.

A decision on whether to grant a motion for new trial based on newly discovered evidence rests in the sound discretion of the trial court. *Sulltrop v. Sulltrop*, 655 S.W.2d 850, 851 (Mo.App.1983). Such motions are viewed with disfavor and are granted only in exceptional circumstance. *Id.* The trial court's ruling on a motion for new trial should be disturbed only upon a finding of an abuse of discretion. *Rompadine, Inc. v. Executive International Inn, Inc.*, 556 S.W.2d 190, 193 (Mo.App.1977). In order to be entitled to a new trial, movant must show: 1) the evidence has only recently come to movant's attention; 2) due diligence would not have uncovered the evidence sooner; 3) the new evidence is so material it would probably produce a different result; 4) the

---

1. The motion for reconsideration is treated in the motion and in appellant's brief as part of appellant's motion for new trial and not as a motion for restoration under § 475.083.6. Therefore, our analysis is only as to the motion for new trial.

new evidence is not cumulative; and 5) the object of the evidence is not to impeach the character or credit of a witness. *Sulltrop,* 655 S.W.2d at 851–52.

■ After trial, on January 5, 1994, two additional physical and psychological examinations were performed on Mrs. Nelson by the Geriatric Assessment Center. Essentially, the evidence was cumulative of testimony given at trial by Dr. Emmanuel Pardo, a psychiatrist, and other witnesses. Also, there was no showing that the evidence could not have been discovered before trial. Mrs. Nelson has not met the standard for a new trial. The trial court did not err in denying Mrs. Nelson's motion for new trial.

### Sufficiency of the Evidence

The trial court found that Mrs. Nelson was partially incapacitated (as to her ability to care for her physical needs) and totally disabled (as to her ability to manage her financial affairs). Mrs. Nelson claims that the trial court erred by imposing a limited guardianship of her person and full conservatorship of her assets because the evidence was not sufficient to support the trial court's findings of partial incapacity and full disability.

■ The concept of capacity has to do with the ability to handle basic requirements for food, shelter, safety and health. An incapacitated person is one who is "unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions" to such an extent that serious injury, illness or disease is likely to occur. Section 475.010(8) RSMo 1986. Thus, an incapacity requires the existence of some physical or mental condition which puts the person at risk. When a person is incapacitated, whether totally or in part, the court may appoint a guardian for the person to oversee the physical needs of the protectee, either in total or in part, according to the degree of incapacity. Section 475.079 RSMo 1986.

■■ The concept of disability has to do with ability to manage financial resources. A disabled person is one who is "unable by reason of any physical or mental condition to receive or evaluate information or to commu-

nicate decisions" to such an extent that the person lacks ability to manage financial resources. Section 475.010(4)(a). A conservator may be appointed to handle some or all of the financial affairs of the disabled person. Section 475.079.

Disability and incapacity must be proven by clear and convincing evidence. Section 475.075(7). Mrs. Nelson contends on appeal that the court erred because the evidence did not support the findings of the trial court. Therefore, we review the evidence with an eye to determining whether the judgment is supported by clear and convincing evidence.

Mrs. Nelson was 86 years old in the summer of 1993. She developed a colon obstruction and bowel inflammation which caused her to become very ill. She called a neighbor and was taken to a hospital where the diagnosis showed the need for surgery. The record does not indicate that she suffered any difficulty caring for herself or living alone prior to her surgeries. Nor, apparently, did she suffer any significant health problems prior to the development of the intestinal afflictions, other than very poor eyesight. While hospitalized in connection with the surgery, she showed signs of dementia, such as confusion, disorientation, and memory difficulties. Her treating physician, Dr. Bruggen, informed her son that he believed Mrs. Nelson was in the early stages of Alzheimer's disease, and that she would show a progressive decline in her cognitive abilities. A psychiatric evaluation was conducted by Dr. Daniel Ward on September 23, 1993, at the request of Mr. Nelson, while Mrs. Nelson was convalescing at the nursing home. Dr. Ward noted deficits in short term memory and intermediate memory. He also believed that there was some impairment of her judgment and insight. Dr. Ward referred Mrs. Nelson to a psychologist, Sandra Radom, who tested Mrs. Nelson on September 29. Dr. Radom found Mrs. Nelson at first to be articulate and knowledgeable, and then found further into the examination that Mrs. Nelson had a tendency to become confused and to lose focus when given matters of some complexity to think through. For instance, when asked to count backward from 20, Mrs. Nelson was able to make it only to twelve

before erring. Dr. Radom's conclusion was that Mrs. Nelson was suffering from moderate dementia, probably of the Alzheimer's type.

After Mrs. Nelson secured her release from the nursing home and returned to her home, Mrs. Nelson was evaluated by Dr. Emmanuel Pardo, Associate Professor of Psychiatry at Kansas University Medical Center. Dr. Pardo evaluated Mrs. Nelson in November, 1993. Dr. Pardo disputes the suggestion that Mrs. Nelson is suffering from Alzheimer's disease. Instead, his conclusion was that Mrs. Nelson had been suffering from reversible dementia and delirium which resulted from her health complications, her pain, and the anxiety related to the surgery and the aftermath of the surgery. Dr. Pardo found her memory at the time he examined her to be no worse than that of others who are 86 years old and in similar situations. Although he found her to have memory impairment, in his opinion her impairment was not of such a degree that it interfered with her ability to evaluate her circumstances and make decisions in her best interest. Dr. Pardo did not administer any tests designed to reflect mental agility which are used for dementia screening, of the type administered by Dr. Radom. He has based his opinion primarily on his hour-long interview with Mrs. Nelson. Dr. Pardo said that at the time he examined her, she was not confused, although she did have some memory problems. Dr. Pardo stated that he believed that as Mrs. Nelson continued her recovery from the trauma of surgery, her confusion was being resolved. Dr. Pardo testified that in his opinion Mrs. Nelson is still intellectually capable of evaluating, receiving and processing information and making decisions in her best interest.

There was also testimony presented by employees of Mrs. Nelson's bank. The bank employees expressed concerns about the fact that Mrs. Nelson seemed dependent on Mrs. Burnett. They also noted that Mrs. Nelson had withdrawn substantial amounts of cash to carry with her, and had transferred substantial amounts of money between accounts. Their testimony suggested that on one occasion Mrs. Nelson either forgot about a $40,-000.00 transaction, or became confused about it. The evidence showed Mrs. Nelson made transfers of $24,000.00, $50,000.00 and $80,-000.00 between accounts in the Fall of 1993, but the record failed to show that there was anything sinister about these transfers. The evidence also showed that Mrs. Nelson on a number of occasions cashed checks for significant amounts of cash. In one instance, she cashed a check for $1,000.00.

Kevin Bell, Mrs. Nelson's stockbroker, testified that he had assisted Mrs. Nelson with her investments for eight or nine years, and that she always seemed to him to be capable of handling her financial matters herself. Mrs. Burnett also testified Mrs. Nelson was capable of taking care of her business herself.

Mrs. Nelson's testimony, which we have carefully reviewed, was first elicited when Mrs. Nelson was called to the stand by the attorney for Bill Nelson. It was late in the afternoon, and Mrs. Nelson, who had been up since early in the morning, said she was very sleepy. In our view, Mrs. Nelson's testimony could be characterized as coherent, although not always articulate. There were some gaps in her memory, and some of her testimony was less than clear. She knew her attorney's first name, but could not seem to recall the last name. Also when asked about her stockbroker, Kevin Bell, she referred to him one time as "Keith." When asked about the current year, she expressed the belief it was 1996. She knew the name of the hospitals she had been in for her surgeries. She knew the name of the nursing home in which she had resided. She was familiar with her surgeries. She knew her son and grandson. She knew the name of the woman who resides with her. She knew her bank. She explained the reason for the transfers between accounts was to keep all account balances below the $100,000.00 figure for which federal deposit insurance is provided.[2] It was clear from her testimony she likes to

---

2. The record was unclear as to whether this explanation for the transfers seemed to correspond with the facts. There was, however, no evidence presented that any money was unaccounted for.

have cash on hand for various reasons. She seemed generally familiar with her stock holdings. She was familiar with the fact that trusts had been set up for her son and her grandson. She explained how she became acquainted with Mrs. Burnett, and the ways in which Mrs. Burnett is a help to her. She recalls loaning some money—she said "about $7,000.00 or more" to Sheryl Burnett.[3] She evidenced slight confusion in explaining about the loan:

Q: Do you remember how much money you loaned her?

A: Oh, it was about seven thousand or more. And I remember that well.

Q: All right, and does she still owe that money to you?

A: No, she doesn't.

Q: She paid it off?

A: She, well, at first she wrote her note for and paid it off real, real good. And then the rest she said, Margaret, I'm not going to be able to make the kind of payments that we've made in the past. If you can stand smaller amounts. And I said, well, I'll have to. And she said, no, if not I'll do it some other way for you. And I said, no, it's all right with me.

So, then she set up a plan and asked me if I was interested. And I said, yes, that's, money is money.

Q: Okay.

A: So, that was that.

Q: Okay. And that money was loaned to her, the Seven Thousand Dollars or so—

A: Yes.

Q: —was loaned to her about a year ago?

A: I can't tell that without going to my books and looking.

Q: All right. Have you loaned her other money besides that?

A: No, no. She does a lot for me but I don't give her anything for it because I figure that she, I need her almost every day. And, so I just don't.

She testified that her housemate cooks for her and keeps the house clean. Mrs. Nelson takes care of her own needs in connection with her colostomy. She seemed to indicate that she is doing well under her present circumstances, although she is dependent upon others, particularly Sheryl Burnett, to assist her with her financial matters. She has a "reading machine" at home which enables her to read many items for herself at home, but away from home she is unable to read. Her testimony was fully consistent with the proposition that she is able to make her own health care decisions and understands her needs from a health standpoint.

What emerges from the record is a lack of trust running several directions between the parties. Mrs. Nelson no longer trusts her son to do what is best for her. Bill Nelson does not trust Sheryl Burnett, and Sheryl Burnett does not trust Bill Nelson. It is also clear from the trial court's judgment that the trial court is reluctant to leave Mrs. Nelson in a position where she is vulnerable to Mrs. Burnett or others.[4] Regardless of the nature of her dementia, whether Alzheimer's or something which is less threatening, it was clearly established that Mrs. Nelson suffers at least some mild dementia, manifested in some loss of memory, some degree of lack of orientation as to time, and also some difficulty in focusing on complex matters. There was some suggestion in the record that Mrs. Nelson may have hallucinated or fantasized about a few items, but the record offers nothing concrete in that regard.

The forgetfulness of old age is not a sufficient basis for a finding of incompetency. *Matter of Armstrong*, 573 S.W.2d 141, 144 (Mo.App.1978). It must be shown that the powers of reasoning and comprehension have been so far destroyed or reduced by mental weakness resulting from one cause

---

3. The record indicates that there was a loan of $7,500 which was documented at the time the loan was made by a promissory note. Mrs. Burnett also testified that the loan was paid off. Mrs. Burnett, however, testified the amount of the loan was $8,750.

4. No doubt the trial judge was very uncomfortable with the fact that Mrs. Burnett was reluctant to testify as to certain matters, and when the court asked Mrs. Burnett if she had ever served as a guardian or as a personal representative, her response was to invoke her right to remain silent under the Fifth Amendment.

or another that the person is incapable of knowing and appreciating the nature and consequences of his acts in respect to his own conduct and the management of his property. *Id.* Here the evidence establishes by clear and convincing evidence that there is some mild to moderate interference with her powers of reasoning and comprehension as to sophisticated matters, and matters beyond the routine of daily life.

### Least Restrictive Environment

The fact that she has some degree of interference with her ability to manage her resources, however, does not end the inquiry in this case. We must also determine whether the trial court correctly applied the requirement of the least restrictive environment. Section 475.075.10 provides as follows:

> If the court finds the respondent to be in some degree incapacitated or disabled, or both, the court, in determining the degree of supervision necessary, shall apply the least restrictive environment principle as defined in this chapter and shall not restrict his personal liberty or his freedom to manage his financial resources to any greater extent than is necessary to protect his person and his financial resources.

This requirement of the law, together with the requirement that disability be proven by clear and convincing evidence, shows a desire to defer in close cases to the dignity and personhood of the alleged incapacitated or disabled person rather than to take a strict paternalistic approach of utmost security. We must review the trial court's order with the view to determining whether the court appropriately limited the restrictions imposed upon Mrs. Nelson. The trial court found Mrs. Nelson totally disabled and declared that Mrs. Nelson "shall no longer have the right or capacity to contract, nor make inter vivos or testamentary transfers, or dispositions of property except that respondent retains the right to a personal spending allowance of $250.00 per month."

Presumably, the trial court believed Mrs. Nelson has Alzheimer's disease,

and the court took an approach to her care that made provision for her continued rapid decline. Whether or not Mrs. Nelson has Alzheimer's, which issue was disputed by competent experts, our duty at this point is to review the December 20, 1993 judgment of the trial court in the light of the evidence of Mrs. Nelson's condition at the time of the hearing.[5] Since an adjudication of partial disability does not affect the presumption of competency, an adjudication of partial disability may not offer protection against the enforceability of a contract made by the protectee. Borron, 5C *Missouri Practice–Probate Law and Practice* § 2016 (2d ed. 1992). It has been suggested that if the object of the proceeding is to protect the protectee's financial resources from waste, it may be necessary to effect an adjudication of total disability and, in conjunction therewith, subtract out the rights and privileges to which the protectee should be entitled under the evidence. *Id.* We believe the trial judge was concerned about the possibility that others might take advantage of Mrs. Nelson in complex financial matters by virtue of her mild dementia and her poor eyesight. The court's concerns properly relate to her capacity to enter into contracts, and especially those involving significant sums of money. We conclude these concerns were proper under the evidence. Therefore, we affirm the finding of disability. However, we believe the trial court erred in limiting Mrs. Nelson's personal spending allowance to $250.00 per month. We conclude from our review of the record that the evidence supports a personal spending allowance of a much larger amount, in keeping with the evidence that Mrs. Nelson satisfactorily runs the financial affairs of every day life. We conclude that the evidence supports a personal spending allowance of $2,500.00 per month, which Mrs. Nelson should use for the payment of bills, household expenses, vehicle maintenance, groceries, grooming, veterinary care for her animals, yard care, colostomy bags, prescriptions, entertainment and other expenses. She should also be entitled to make gifts to others from her spending allowance. All oth-

---

5. There is no chemical or physical test for Alzheimer's which can be administered to a living person, according to all the testimony. It is a clinical diagnosis, which could be best made by a physician dealing with her over an extended period of time.

er matters will be handled by the conservator, including, of course, tax and investment matters. If at some time in the future Mrs. Nelson ceases to pay the bills of her living expenses in reasonably timely fashion, the conservator may petition the court for an increase in powers pursuant to § 475.083.7 RSMo.1986. She should be permitted, if she can, to accumulate funds from her spending allowance, which she should also be able to handle as she chooses. Allowing her to pay her own regular expenses will save some of the expense of having her assets administered by a conservator, and will allow Mrs. Nelson the dignity of being able to control the financial affairs of her everyday life. She should be entitled to create bank accounts out of her spending allowance, and to title them as she desires. The conservator shall keep her apprised of her income and investment performance, and consult with her as to investment strategy.

■ The existence of a conservatorship does not necessarily preclude the capacity to make a will. *Hugenel v. Keller,* 867 S.W.2d 298 (Mo.App.1993). Section 475.078(3) provides that someone who has been previously adjudicated to be incapacitated or disabled shall be presumed to be "incompetent." Such an adjudication, however, is only presumptive, not conclusive, evidence of testamentary incapacity. *Hugenel,* 867 S.W.2d at 304. If Mrs. Nelson has executed a recent will, or executes one in the future, the proponent of the will must show the existence of testamentary capacity at the time of the making of the will. It is an erroneous application of the law for the trial court to enter an order that Mrs. Nelson shall no longer have the capacity to make testamentary dispositions. Any portions of the judgment purporting to impose restrictions on her in this respect are reversed.

### Incapacity

■ The record fails to show by clear and convincing evidence that Mrs. Nelson is unable at this time to make health care decisions in her own best interest, and fails to show that she is unable to make competent

decisions concerning her living circumstances, including her place of residence. The judgment of incapacity as to her physical needs, and the appointment of the guardian of her person, is reversed.[6] She should also, as long as her capacity to do so is not diminished, be permitted to grant a durable power of attorney for health care decisions to her son or others if she chooses to do so.

### Conclusion

The judgment of incapacity is reversed. The judgment of disability as to financial matters is affirmed, but the judgment is reversed to the extent that it restricts Mrs. Nelson from exercising testamentary rights, and to the extent that it limits her to a spending allowance of less than $2,500.00 per month. She is hereby granted a spending allowance of $2,500.00 per month. Rule 84.14. Since the trial court has continuing jurisdiction over conservatorships, this amount may be modified in the future pursuant to § 475.083.4 through 475.083.7 when modification is appropriate under the evidence adduced at that time.

All concur.

---

6. The disposition rendered herein makes it unnecessary for us to address Mrs. Nelson's contention that the trial court's findings of fact were insufficient.