**ESTATE OF Loel Grace SCHOOLER.**

**Michael W. Torrey, Appellants,**

v.

**Joseph Jay Hemenway, Defendant,**

**Carolyn Sealine, Respondent.**

**No. WD 65910.**

Missouri Court of Appeals,
Western District.

Oct. 31, 2006.

Russell A. Fracassa, Liberty, for appellant.

Thomas J. Keedy, Unionville, for respondent.

RONALD R. HOLLIGER, Judge.

Michael W. Torrey ("Torrey") appeals a judgment of the probate court removing him as successor guardian of the person of his aunt, Loel Grace Schooler ("Schooler"). Torrey raises two points on appeal. In his first point, Torrey claims that the probate court erroneously applied the law by limiting his authority as guardian despite the absence of any limitations in the letters of guardianship. In point two, he claims that the probate court's judgment is not sup-

ported by the evidence because there is "no evidence of record" that the guardian failed to discharge his statutory duties or failed to act in the best interests of the ward. We find that the probate court had the authority to require its approval of a change in the ward's residence and that its judgment removing Torrey as guardian was supported by substantial evidence and not against the weight of the evidence.

Judgment affirmed.

## Factual and Procedural Background

Mrs. Schooler, who is 86 years old, was diagnosed as having progressive Alzheimer's disease, and determined to be incapacitated by the probate court in Mercer County in June of 2000. At the time of that determination, Jack Torrey, Schooler's brother, was appointed as her guardian, and the Public Administrator of Mercer County, was appointed as her conservator. Since sometime in early 2000, Schooler has resided at Bristol Manor ("Bristol"), a residential care facility in Princeton, Missouri.

Sometime in 2003, Jack Torrey's son, Michael Torrey, at the request of his father, placed Schooler on a waiting list to be admitted as a resident to Seasons Care Center ("Seasons"), a Skilled Nursing Facility in the Kansas City area specializing in treating Alzheimer's patients. In February of 2005, just prior to the death of his father, Torrey filed a request to succeed his father as guardian, and the Public Administrator filed her own motion to be appointed successor guardian.

On May 10, 2005, the probate court held a hearing on both motions. At that hearing, the probate court heard testimony from Schooler and others expressing a concern that a change in guardianship might result in a change of Schooler's residence from Princeton to somewhere in the Kansas City area, where Torrey lives.

Torrey testified at that hearing that if appointed, he had no intention of moving Schooler from Princeton, although he did express a desire that she be medically evaluated. Torrey made no mention of the waiting list at Seasons at this hearing. On the same day this hearing was conducted, Joy Schult, R.N. ("Schult"), visited Schooler at Bristol to conduct an evaluation. Schult is a geriatric nurse and placement specialist who ultimately recommended moving Schooler from Bristol to Seasons.

The probate court appointed Torrey as successor guardian on May 20, 2005, noting in its judgment the concerns about a potential change in Schooler's residence, along with Torrey's assurance that he did not intend to move her. The judgment appointing Torrey also recited that: "Before there could be a change of residence, should such a change be proposed, there would first need to be approval by the Court."

Less than two months after the hearing that resulted in his appointment as guardian, Torrey left Bristol with Schooler, telling the staff that he was taking her out to eat. After stopping to eat at a McDonald's, he drove Schooler to Kansas City, arriving at Seasons three hours later. Sometime that same afternoon, Torrey's attorney called Bristol and the Public Administrator to inform them that Schooler would not be returning to Bristol that day, and was in Kansas City. During the next three weeks, Schooler underwent evaluations by doctors in Kansas City.

In the meantime, the court, apparently having been informed of Torrey's actions by the Public Administrator, scheduled a review hearing, at which Torrey testified as to the above described events. On the day of that hearing, Torrey filed a request to change Schooler's residence from Bristol to Seasons. The court appointed a

guardian ad litem and scheduled a second hearing, at which the motion to change residence was taken up along with a continuation of the court's review of Torrey's guardianship. On the same day as the second hearing, Torrey filed a motion for maintenance and support, covering the bill for Schooler's stay at Seasons up to that point.

At that hearing, the court heard further testimony from several witnesses, including Torrey, Schult, and Dr. Tammy Hart ("Hart"), who had treated Schooler for the five years she resided at Bristol.

Both Schult and Hart testified that a move from one facility to another can cause stress for an Alzheimer's patient. Schult testified that, given the progressive nature of the disease, she was of the opinion that Seasons would be a better facility for Schooler in the long-term, and that a move would be less stressful if made before the patient's condition deteriorates to the point of necessitating such a move. Conversely, Dr. Hart testified that such a move can precipitate deterioration in the patient's condition. She also testified that Schooler was receiving appropriate care at Bristol, and that further evaluations of Schooler's condition would have been possible without moving her to Kansas City for an extended period.

Following the second review hearing, the probate court entered a judgment removing Torrey and appointing the Public Administrator as Schooler's successor guardian. Torrey appeals that judgment.

### Discussion

■ In his first point on appeal, Torrey argues that the probate court erroneously applied the law. A court-tried probate case is reviewed under the standard of *Murphy v. Carron*, 536 S.W.2d 30 (Mo.

banc 1976). Under that standard, the probate court judgment will be sustained "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32.

Torrey's argument that the probate court misapplied the law relies upon the final sentence of subsection 10 of section 475.075 of the Revised Statutes of Missouri for the proposition that the probate court was without authority to remove him as Schooler's guardian. This argument, however, is predicated on a misinterpretation of the meaning and purpose of section 475.075.10.

■ That subsection codifies the "least restrictive environment" principle. The least restrictive environment principle embodies a "desire to defer in close cases to the dignity and personhood of the alleged incapacitated or disabled person rather than to take a strict paternalistic approach of utmost security." *Matter of Nelson*, 891 S.W.2d 181, 187 (Mo.App. W.D.1995). Toward this end, the probate code mandates a hierarchy of preferred remedies where incapacity is alleged.

Under this statutory regime, the probate court considers the degree of supervision necessary, including whether the person alleged to be incapacitated might be appropriately served without appointing a guardian. Section 475.075.10, RSMo (2000). If a guardian is to be appointed, the first preference is for a guardian ad litem. *Id.* If more than a guardian ad litem is required, the court should consider the appointment of a limited guardian. *Id.* Finally, and as a last resort, the court will consider the appointment of a general guardian.[1] *Id.*

---

1. While the code does not use the term "gen-        eral guardian," it is clear from context that

In the event that the court determines the appointment of some form of guardian is necessary, the code requires that "[t]he limitations imposed upon the authority of the guardian or conservator as set forth in the findings of the court shall be stated in the letters of the guardian or conservator and shall be set forth in the notice of first publication of letters of conservatorship granted." *Id.* Torrey's argument misconstrues this last sentence.

Torrey extracts this final sentence from its context, suggesting that it stands for the proposition that the court can place no limitation on the guardian not contained in the letters of guardianship. This reading of the statute would suggest that once a guardian has been appointed, the probate court is without any authority to limit the discretion of that guardian. A reading of the statute in context, however, makes clear that the "limitations" contemplated by this sentence consist merely of the appointment of a limited guardian or a guardian ad litem, as opposed to the appointment of a general guardian.

Thus, in the present case, the absence of limitations "stated in the letters of the guardian" suggests no more than that Torrey was appointed as a general—rather than limited—guardian. The distinction between a limited guardian and a general guardian can be discerned by looking to section 475.080.1, which governs the appointment of a limited guardian. That section directs the court to appoint a limited guardian of the person if it finds the person to be "partially incapacitated." The section continues:

The order of appointment shall specify the powers and duties of the limited guardian so as to permit the partially incapacitated ward to care for himself commensurate with his ability to do so and shall also specify the legal disabilities to which the ward is subject. In establishing a limited guardianship, the court shall impose only such legal disabilities and restraints on personal liberty as are necessary to promote and protect the well-being of the individual and shall design the guardianship so as to encourage the development of maximum self-reliance and independence in the individual.

Section 475.080.1, RSMo.

As is clear from this language, the purpose of a limited guardianship is to preserve the dignity of the ward, and has no bearing upon the authority of the court in relation to the guardianship. Thus, were "limitations" of the sort contemplated by section 475.075.10 stated in the letters of guardianship, such limitations would exist with the purpose of reserving to the ward a range of dignity and discretion at the expense of the guardian's authority. In no event would "limitations" of the sort intended by section 475.075.10 enlarge or reduce the authority of the probate court. To the contrary, the probate court has an ongoing duty to supervise the relationship between guardian and ward regardless of the type of guardianship at issue. *See* sections 475.082 RSMo. (requiring court to regularly inquire into the status of wards and protectees), 475.110 RSMo (reciting grounds for the removal of a guardian).

■ While it is true, as Torrey asserts, that the probate court is not to "interfere with arrangements made by the guardian within a certain discretionary range," *Es-*

---

the term "guardian" is used in two senses—first, as a synonym for the phrase "general guardian," as in the second sentence of section 475.075.10; and second, as a generic term referring to any sort of guardian, wheth-er general or limited, as in the last sentence of section 475.075.10. *See* section 475.010 (defining the term " 'guardian' [to include] 'limited guardian' unless otherwise specified or apparent from the context").

tate of Hendrickson v. Hendrickson, 604 S.W.2d 17, 19 (Mo.App. W.D.1980), the court, nonetheless, "has power to order specific actions by the guardian, or may in a proper case remove the guardian." *Id.* Of particular significance in the present case is the well-established principle that "[t]he provisions for an abode for the ward are subject to the supervision of the court." *Id.* (citing *St. Vincent's Sanitarium v. Murphy*, 209 S.W.2d 560 (Mo.App. 1948)). Because the probate court did have the authority to proceed as it did, no erroneous application of the law occurred.

In his second point, Torrey asserts that "there is no evidence of record that the guardian failed to discharge his duties and responsibilities" and that the guardian acted in the best interests of the ward. Because the probate court did find that the guardian failed to "discharge his duties and responsibilities as required by Chapter 475 and has not acted in the Ward's best interests," the questions for this court are whether those findings are supported by substantial evidence and whether they are against the weight of the evidence.[2] *Murphy*, 536 S.W.2d at 32. Because the record contains evidence supporting the probate court judgment, and that judgment is not against the weight of the evidence, Torrey's second point is without merit.

■ "Substantial evidence is competent evidence from which the trier of fact could reasonably decide the case." *Wallace v. Van Pelt*, 969 S.W.2d 380, 382 (Mo. App. W.D.1998). This court will set aside a judgment as against the weight of the evidence only "with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32. Both when considering the existence of substantial evidence and when assessing the weight of the evidence, this court defers to the probate court in its role as the finder of fact, giving "due regard to the opportunity of the trial court to have judged the credibility of witnesses." Rule 84.13(d)(2).

The probate court's findings regarding Torrey's failure to discharge his duties and responsibilities as guardian could be based on either of two statutory grounds, both contained in section 473.140.[3] While that section states various grounds for removal, the two grounds of relevance here are that a guardian may be removed if he becomes "in any manner incapable or unsuitable to execute the trust reposed in him," or if he "wastes or mismanages the estate." Section 473.140, RSMo. In rendering judgment, the probate court had before it evidence sufficient to support Torrey's removal on either of these grounds.

## Unsuitable to exercise the trust reposed in him

■ In its judgment removing Torrey as guardian, the probate court specifically found that Torrey was "reckless and dishonest when he moved [Schooler] to [Seasons]," and had "deliberately defied, in both spirit and action, the Court's Order of May 20, 2005." The May 20 order accompanied Torrey's appointment as successor

2. While Torrey's second point merely states that there was "no evidence of record" regarding grounds for removal, the argument section of his brief asserts both a lack of evidence and that Torrey's removal is against the weight of the evidence. While Torrey's brief is thus in violation of Rule 84.04(e), requiring that argument be limited to errors included in a point, we choose to review this argument.

3. Section 473.140 is incorporated into chapter 475 by section 475.110, which states that "[a] guardian or conservator may also be removed on the same grounds as is provided in section 473.140, RSMo, for the removal of personal representatives."

guardian, and contained the caveat that "[b]efore there could be a change of residence, should such a change be proposed, there would first need to be approval by the Court." This language was included to address concerns, expressed at the appointment hearing, that Torrey would move Schooler to the Kansas City area if appointed. At that hearing, Torrey testified that he did not intend to move Schooler. Nonetheless, within two months of giving this testimony, Torrey transported Schooler to Kansas City, taking her directly to Seasons, where she had been on an admissions waiting list for the past two years.

Of particular relevance in addressing whether Torrey was suitable "to exercise the trust reposed in him," is the fact that he actually took Schooler to Kansas City under the pretext that he was taking her out to lunch. This subterfuge allowed Torrey to take Schooler from Bristol to Seasons without giving any prior notice to her regular physician, her conservator, the staff at Bristol, or the probate court.

During the hearings that precipitated his removal, Torrey asserted that this move was not a change of residence in defiance of the prior order, but was merely for the purpose of medical evaluations. The probate court also heard testimony from Schooler's regular physician that day trips or overnight trips could have been arranged to see specialists for similar evaluations either in Kansas City or at facilities closer to Princeton. Further, on the same day that the first hearing on removal took place, Torrey filed a motion requesting that Schooler's residence be changed permanently to Seasons.

■ It was within the province of the probate court to disbelieve Torrey's testimony concerning his motives. The court could have found, as it apparently did, that Torrey intended to permanently move Schooler and had attempted to do so by way of a fate accompli.[4] In considering the credibility of witnesses, "[t]he trial judge as the trier of fact can disbelieve testimony even where uncontradicted." *MECO Sys., Inc. v. Dancing Bear Entm't, Inc.*, 42 S.W.3d 794, 799 (Mo.App. S.D. 2001) (internal quotation marks and citation omitted). This general rule is particularly appropriate where, as here, the testimony in question concerns the intent of the witness himself, and the probate court was free to disbelieve Torrey's testimony concerning his motivation for taking Schooler to Kansas City on July 8.

Even if the court were to accept Torrey's explanation of his motives and actions, the way in which he moved Schooler to Seasons suggests, at the least, an inability to work with the conservator in arranging for Schooler's care. Taken in the light most favorable to the judgment, the evidence supports the conclusion that Torrey's actions demonstrated his unsuitability "to exercise the trust reposed in him," as required by section 473.140. As such, the probate court judgment was supported by substantial evidence.

■ It is similarly unavailing to suggest that the probate court judgment went against the weight of the evidence since a judgment "may be set aside as being against the weight of the evidence only with caution and with a firm belief it is wrong." *In re Marriage of LeGall,* 171 S.W.3d 125, 127 (Mo.App. S.D.2005). "The mere existence of evidence from which another conclusion might have been reached

---

4. The probate court noted that approval of Torrey's request to keep Schooler at Seasons would "validate his blatant disobedience" based on the rationale that "what's done's done, and that the Ward should not now be put at risk by being moved [again]."

is not enough to demonstrate that the holding of the trial court is contrary to the weight of the evidence," *Purdun v. Purdun,* 163 S.W.3d 598, 601–02 (Mo.App. W.D.2005), because "the trial judge who saw and heard the witnesses is in a better position to consider all of the evidence[.]" *Hart v. Hart,* 766 S.W.2d 131, 133 (Mo. App. W.D.1989).

### Waste

The probate code also authorizes the removal of a guardian or conservator who "wastes or mismanages the estate." Section 473.140 RSMo. Torrey's failure to discuss his intended relocation of Schooler with the conservator implicates this section of the code. In its judgment removing Torrey, the probate court notes that Torrey's "decisions have had a financial impact, a fact for which he has shown little appreciation." For the months of July and August, Schooler incurred a bill for $8,600 as a result of her stay at Seasons. By placing Schooler at Seasons, Torrey caused the estate to incur this debt, and he did so without consulting the conservator who is charged with managing Schooler's assets. Because Torrey chose to move Schooler in the way that he did, she incurred these expenses at Seasons while simultaneously being charged for her apartment at Bristol. Schooler also incurred redundant medication expenses, since her prescriptions had to be refilled when she arrived at Seasons.

Where a guardian or conservator causes unnecessary expenses to accrue to the estate of a ward or protectee, grounds for removal exist. *See In Re Estate of Phillips,* 901 S.W.2d 304, 308 (Mo.App. S.D.1995) (removing guardian for, *inter alia,* incurring "$1869 in unnecessary expense by failing to timely purchase a burial plan," and "failing to discontinue telephone service to the ward's home when no

one resided there"). Given the testimony of Schooler's regular physician that evaluations similar to those conducted at Seasons could have been obtained without moving Schooler to Kansas City for an extended period, the probate court was justified in concluding that Torrey's actions constituted mismanagement and waste.

Torrey presented no evidence to contradict this conclusion, conceding at the removal hearings that he "could have communicated better." In light of the debt incurred by Schooler's estate, the probate court judgment removing Torrey was supported by substantial evidence. Further, given that the evidence of mismanagement and waste before the probate court was uncontradicted, the judgment was not against the weight of the evidence.

### Best Interests

Alternatively, the probate court's finding that Torrey did not act in Schooler's best interests constitutes grounds for removal under 475.082.5, which authorizes a court to enter an appropriate order, including the removal of the guardian, where it finds that the guardian "is not acting in the best interests of the ward."

During the final hearing on removal, the probate court heard testimony from Schooler's regular physician as well as the placement specialist consulted by Torrey that a change in environment of the sort that occurred here can cause deterioration in an Alzheimer's patient's condition. The two witnesses disagreed as to the level of risk and whether it was advisable to move Schooler when Torrey did so. While no evidence was presented that Schooler actually experienced any adverse effects from the move, it is uncontradicted that Torrey's actions put Schooler at some risk. Given the evidence adduced, the probate court could have concluded that this risk

was unnecessary, and placing Schooler at such risk was not in her best interests.

Alternatively, the court could have assessed the manner in which Torrey carried out Schooler's move, which it characterized as "reckless and dishonest," and come to the conclusion that Schooler's best interests were not being served by Torrey's guardianship. Finally, the probate court also had before it evidence from the hearing on appointment of a successor guardian in which Schooler testified to her desire to remain in Princeton. In its judgment removing Torrey, the court noted the significance of Schooler's relationships with family and friends in both Princeton and Kansas City. It is the legitimate role of the probate court to weigh these considerations in determining what is in the best interests of a ward under its jurisdiction.

While various witnesses at the removal hearings disagreed as to what actions would have been in Schooler's best interests, there was substantial evidence on both sides of the dispute. Given the testimony on both sides of this question, the present case is not one in which a review of the evidence before the probate court produces "a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32.

### Conclusion

In a bench-tried case, a judgment will be sustained if it is supportable on any ground, whether stated by the trial court or not. *See McDermott v. Carnahan*, 934 S.W.2d 285, 287 (Mo. banc 1996). In the present case, the probate court's judgment is supported by evidence that Torrey was unsuitable to exercise the trust reposed in him, evidence that Torrey committed waste and mismanagement of Schooler's estate, or evidence that Torrey failed to act in Schooler's best interests. Further, a judgment of removal rendered upon any of these grounds would have been consistent with the weight of the evidence before the probate court.

The judgment is affirmed.

JOSEPH M. ELLIS, Presiding Judge, and ROBERT G. ULRICH, Judge, concur.