Debbie S. DOLAN, Respondent,

v.

John J. HIGMAN, Appellant.

No. WD 67003.

Missouri Court of Appeals,
Western District.

June 26, 2007.

Steven M. Petry, Kansas City, MO, for appellant.

Richard E. Rose, Kansas City, MO, for respondent.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN, and RONALD R. HOLLIGER, JJ.

THOMAS H. NEWTON, Presiding Judge.

Ms. Debbie Dolan brought an action requesting the appointment of a conservator for her father, Mr. John J. Higman. Following a jury trial in 2006, the circuit court appointed the Public Administrator as conservator for Mr. Higman who is 87 years old. Mr. Higman appeals. We reverse and remand the case.

From the evidence, it appears that Ms. Dolan was concerned about her father's financial decisions. Her concerns began when Mr. Higman met a man named Mr. Jeff Detrick at the Ethelene church and they became roommates in Mr. Higman's home. Mr. Detrick had various interests such as: treasure hunting for gold in southern Missouri and astrological readings. Mr. Detrick tried to assist Mr. Higman first to lease and then to purchase property in southern Missouri. Mr. Detrick wanted to obtain the land to fulfill Mr. Higman's retirement wishes; and Mr. Detrick wanted to be closer to his treasure hunting areas. Under the initial agreement, Mr. Higman would pay $5,000 per year to lease part of a farm. When the owners decided they did not want to lease but wanted to sell the whole farm instead, Mr. Higman, Mr. Detrick, and Mr. Frank Canan, another acquaintance from the church, agreed to split the price equally. Mr. Detrick claimed that he could easily raise the funds because he had raised two million dollars from investors to fund various inventions. The purchase price of the property was $350,000, which was slightly less than the appraised price. The contract made in preparation for the sale listed only Mr. Detrick's name as a buyer. Mr. Higman put ten thousand dollars into escrow as a deposit on the farm. Additionally, Mr. Higman cashed a CD for seventy thousand dollars in preparation for the sale. The other two contributed nothing.

When the sale did not go as planned by the contract date because Mr. Detrick had failed to raise funds, Mr. Higman decided to purchase the farm himself. To obtain the funds for the purchase, Mr. Higman and Mr. Detrick went to Great American Investors ("Great American") to take a loan against Mr. Higman's investment accounts. They attempted to expedite the process, and Mr. David Richards of Great American refused to give Mr. Higman the loan and tried to dissuade him from making the purchase. Mr. Richards informed Ms. Dolan about the situation, and she later filed this action.

At trial, she testified that she did not care about being appointed conservator, but she was concerned because her father had a propensity in the previous three to four years of becoming involved with people who promised him big returns on investments; and he informed her that there was twenty to thirty million dollars worth of gold buried on the property.

Mr. Detrick testified that he did not accompany Mr. Higman on any of his trips to collect money for the purchase; however, Mr. Richards testified that Mr. Detrick was present at one of the meetings. An employee at a bank testified that she had

seen Mr. Detrick enter the bank on one occasion after she had been visiting with Mr. Higman in her office.

Evidence was presented that an agent at Great American churned Mr. Higman's investment account. Churning is the active trading of an account with a high turnover rate. Ms. Dolan testified that she contacted her father about substantial losses from the churning. In response to her recommendation that he file a complaint with the SEC and NASD, he agreed, but asked her to file the complaint.

Medical records were produced from 2004 and 2005, indicating that Mr. Higman suffered from short and long term memory loss, and dementia. The same records also indicated that he was alert and oriented and that he scored 30/30 on the MMSE (Multi–Mental State Exam).

Mr. Higman did not testify nor was any expert called on to testify for or against the conservatorship. At the close of Ms. Dolan's case and again at the close of all evidence, Mr. Higman filed a motion for directed verdict, both of which were denied. After the verdict, Mr. Higman filed a JNOV motion, which was also denied.

Mr. Higman raises two points on appeal. First, he asserts that the trial court erred in allowing Ms. Dolan to testify about her role as a conservator if appointed. Second, he argues that the trial court erred in denying his motions for directed verdict and JNOV because Ms. Dolan did not make a submissible case for disability. Since the second point is dispositive of this case, we will not discuss the first point.

■ In reviewing the denial of motions for directed verdict and JNOV, we assess whether the plaintiff made a submissible case. *Ryan v. Maddox*, 112 S.W.3d 476, 480 (Mo.App. W.D.2003). "[A] plaintiff must present substantial evidence that tends to prove the facts essential to plaintiff's recovery" in order to make a submissible case. *Id.* (internal quotations omitted). Evidence is substantial if, considering it to be true, it has probative force upon the issues, which allow the trier of fact to decide a case. *Id.* In order to determine if a submissible case has been made, we view the evidence and all reasonable inferences therefrom in the light most favorable to the prevailing party, and with a presumption that the prevailing party's evidence is true. *Id.* However, we will not supply missing evidence or give the prevailing party the benefit of unreasonable inferences. *Id.* at 480–81.

■ A conservator is appointed for individuals who have been adjudged disabled. RSMo § 475.030.1. The primary responsibility of a conservator is to provide financial assistance to a disabled person. *Ryan*, 112 S.W.3d at 481. The petitioner claiming that a conservator needs to be appointed has the burden of proving that the person is disabled. *Id.* A person is disabled if he is:

[u]nable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that the person lacks ability to manage his financial resources[.]

§ 475.010(4)(a). The ability to manage financial resources is defined in section 475.010(11) as:

those actions necessary to obtain, administer, and dispose of ... property, ... or those actions necessary to prevent waste, loss or dissipation of property, ... or those actions necessary to provide for the care and support of such a person ... by a person of ordinary skills and intelligence commensurate with his training and education[.]

The determination of whether to appoint a conservator is based on the condition of the person at the time of the trial. *Ryan*, 112 S.W.3d at 481.

■ In this case, the evidence showed that Mr. Higman suffered from dementia, short and long term memory loss, confusion, and he had hearing loss at least one year prior to the trial. Memory loss and old age alone are insufficient to justify the appointment of a conservator. *In re Nelson*, 891 S.W.2d 181, 186 (Mo.App. W.D. 1995). No evidence, medical or otherwise, was presented about whether these symptoms were ongoing or had improved. Further, the evidence does not indicate Mr. Higman's condition at the time of trial. The evidence as a whole indicated that Mr. Higman was eccentric and had his own ideas regarding the use of his money. Additionally, both Mr. Higman and Mr. Detrick had somewhat odd beliefs, for instance that there was Spanish gold buried in southern Missouri, and in particular on the farm in question. However odd and different, if not financially questionable, these beliefs were, they do not mean that Mr. Higman had a mental condition that affected his ability to receive and evaluate information, nor that he was incapable of managing his finances. Thus, this evidence was insufficient to produce a submissible case.

Also, evidence was adduced concerning the churning of his investment account. Ms. Dolan had concerns about losses Mr. Higman had sustained from his investment account and discussed it with him. She suggested he contact federal agencies to open an investigation. He requested that she file the complaints. This does not indicate that he is unable to manage his finances. No evidence was presented suggesting that this request was indicative of an inability to manage or communicate about his finances. Merely asking his daughter to do something does not indicate that he cannot communicate, and in fact shows the opposite: that he can communicate about his wishes involving his finances. The fact that he was apparently unaware of any problems is also insufficient for this purpose.

The majority of the testimony focused on Mr. Detrick and his relationship with Mr. Higman. None of the evidence presented indicates that Mr. Higman is incapable of managing or communicating about his finances. Rather, this evidence shows Mr. Detrick has some influence in Mr. Higman's life.[1] Whatever judgments Mr. Higman may be making in the relationship with Mr. Detrick, the evidence does not show that they are made as a result of a physical or mental condition, or an inability to manage his finances due to such a condition. The remaining evidence and, specifically, the medical evidence did not show whether there was a mental or physical condition connected to whether Mr. Higman was actually unable to manage or communicate about his finances.

Because the evidence presented was insufficient to make a submissible case for disability, we reverse and remand for entry of judgment consistent with this opinion.

HAROLD L. LOWENSTEIN, and RONALD R. HOLLIGER, JJ., concur.

■

---

1. We make no judgment on whether Mr. Detrick is actually taking advantage of Mr. Higman. This is merely the interpretation of the events that arises viewing them in the light most favorable to the finding of a disability.